**In re LEAR CORPORATION SHAREHOLDER LITIGATION.**

C.A. No. 2728–VCS.

Court of Chancery of Delaware.

Submitted: June 2, 2008.
Decided: Sept. 2, 2008.

Seth D. Rigrodsky, Esquire, Brian D. Long, Esquire, David R. Lurie, Esquire, Rigrodsky & Long, P.A., Wilmington, Delaware; Ann K. Ritter, Esquire, Motley Rice LLC, Mount Pleasant, South Carolina, Co–Chairs of Plaintiffs' Executive Committee.

Kevin G. Abrams, Esquire, T. Brad Davey, Esquire, Abrams & Laster LLP, Wilmington, Delaware, Attorneys for the Lear Defendants.

Matthias A. Lydon, Esquire, Norman K. Beck, Winston & Strawn LLP, Chicago, Illinois, Attorneys for Lear Corporation.

Kenneth J. Nachbar, Esquire, Jay N. Moffitt, Esquire, William E. Green, Jr., Morris, Nichols, Arsht & Tunnell LLP, Attorneys for Defendants American Real Estate Partners, L.P., AREP Car Hold-

ings Corp., AREP Car Acquisition Corp. and Vincent J. Intrieri.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

In this case, stockholder plaintiffs seek to hold the board of Lear Corporation ("Lear" or "the company") responsible in damages for agreeing to pay a bidder a termination fee payable upon a no vote on a merger in exchange for that bidder increasing its bid from the original merger agreement by $1.25 per share ("the Merger"). The bidder did not face competition from a rival bidder; in fact, Lear had been fully shopped, and no topping bid had emerged. Rather, in a frothy M & A market, stockholders perceived that the original merger price of $36 per share was inadequate and that the original bidder could do better. Facing likely defeat on the $36 merger at the polls, the Lear board bargained to get another $1.25 per share. In exchange, the bidder demanded $25 million in compensation contingent solely upon a no vote, in contrast to the original termination fee, the bulk of which was payable only if Lear consummated an alternative transaction within twelve months. The $25 million represented only 0.9% of the total deal value. According to the amended complaint,[1] the Lear board approved the "Revised Merger Agreement" knowing that it was improbable that its stockholders would agree to the enhanced deal. And, in fact, the shareholders did not approve, and the Merger was defeated.

The defendants have moved to dismiss the complaint against them, primarily arguing that the complaint fails to state with particularity a non-exculpated claim for breach of fiduciary duty. In this opinion, I grant that motion. At bottom, the plaintiffs' theory is that directors who believe in good faith that a merger is good for the stockholders cannot adopt it if stockholder approval is unlikely. That notion is at odds with our law.

Directors are entitled to make good faith business decisions even if the stockholders might disagree with them. Where, as here, the complaint itself indicates that an independent board majority used an adequate process, employed reputable financial, legal, and proxy solicitation experts, and had a substantial basis to conclude a merger was financially fair, the directors cannot be faulted for being disloyal simply because the stockholders ultimately did not agree with their recommendation. In particular, where, as here, the directors are protected by an exculpatory charter provision, it is critical that the complaint plead facts suggesting a fair inference that the directors breached their duty of loyalty by making a bad faith decision to approve the merger for reasons inimical to the interests of the corporation and its stockholders. Where a complaint, as here, does not even create an inference of mere negligence or gross negligence, it certainly does not satisfy the far more difficult task of stating a non-exculpated duty of loyalty claim.

### II. *Factual Background*

The amended complaint in this case is an unwieldy document comprised of 208 paragraphs. As the case evolved, the complaint simply grew, with the plaintiffs adding on to their original complaint without any attempt at editing. Moreover, the current complaint—which is the fourth amended complaint—relies heavily on the proxy statements filed by Lear in connection with the merger approval process and

---

1. For brevity's sake, I refer to this as the complaint.

the discovery record compiled in connection with a preliminary injunction motion this court decided. Furthermore, in their reply brief on this motion to dismiss, the plaintiffs referred the court to its own preliminary injunction decision as forming the factual background for the plaintiffs' recitation of events since that decision.[2] Given the complaint's extensive reliance on the Lear proxies, especially the supplemental proxy filed on July 9, 2007 ("the Supplemental Proxy"),[3] and this court's prior preliminary injunction decision as the basis for their factual allegations and arguments, I use those documents to help fill out the factual recitation, which is primarily drawn from the plaintiffs' current complaint.[4]

### A. The Company

Lear Corporation manufactures interior systems for automobiles and light trucks. Its major customers are the manufacturers of those vehicles, with a particular concentration in supplying the "Big Three" North American-based automobile manufacturers. As a result, Lear's fate is in large measure dependent on the health of those manufacturers.

As one would expect given that reality, Lear experienced a lot of turbulence over the past decade. As detailed in the pre-liminary injunction decision in this case,[5] Lear had come through the worst of these times by mid–2006 and was preparing to implement a restructuring plan. Despite having avoided the need to file for bankruptcy and having seemingly positioned the company for a profitable near future, Lear's CEO (and long-serving company executive) Robert Rossiter was nervous about Lear's long-term prospects, referring to it in an October 2006 email as a "sick company operating in a sick industry."[6] Rossiter, who had much of his wealth tied up in Lear, feared that he would be treated like an unsecured creditor if Lear went into bankruptcy and that his retirement benefits could be lost. Rossiter also felt inhibited in selling his Lear shares, both because of management blackout periods and because he did not want to send a negative signal to the market by selling shares. He desired to stay as CEO but was already 60 years old and was worried about his nest egg. Therefore, he sought to have the Lear board accelerate the payment to him of certain retirement benefits so that he could protect his family against the risk that Lear would become insolvent. But Rossiter backed away from that option when he was informed that it would likely draw attention and ire from institutional investors

---

**2.** Pls.' Br. at 4 n. 3.

**3.** See, e.g., Compl. ¶ 160 (relying on the Supplemental Proxy for frequency of special committee updates on the proxy solicitation process); id. at 161 (block quoting description of a board meeting where the special committee received advice from its financial advisors from the Supplemental Proxy); id. at 167 (block quoting description of solicitation status meeting from the Supplemental Proxy); id. at 175 ("According to the July 9 Supplement . . ."); id. at 185 ("It is apparent from the July 9 Supplement . . .").

**4.** Although as a general rule the court may only consider facts alleged in the complaint when ruling on a motion to dismiss, our Supreme Court has recognized an exception where "the document is integral to a plaintiff's claim and incorporated into the complaint." Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc., 691 A.2d 609, 613 (Del.1996). A document is integral to the claim if "it is the source for the merger-related facts as pled in the complaint." Orman v. Cullman, 794 A.2d 5, 16 (Del.Ch. 2002).

**5.** In re Lear Corp. S'holder Litig., 926 A.2d 94 (Del.Ch.2007).

**6.** Id. at 100.

and from the influential proxy advisory firm, Institutional Shareholder Services ("ISS").

### B. *The "Original Merger Agreement"*

As detailed in the prior preliminary injunction decision, Carl Icahn and his fund, along with its subsidiaries, defendants American Real Estate Partners, L.P., AREP Car Holdings Corp., and AREP Car Acquisition Corp. (collectively "AREP"), presented Rossiter and the Lear board with an option that promised to meet the needs of both Lear's stockholders and also Rossiter's desire for financial security. Icahn, who was Lear's largest stockholder, proposed a going private transaction whereby AREP would acquire Lear for $35 per share. Icahn intended to keep on Rossiter, as well as James Vandenberghe, who was also on Lear's board and was serving as its Vice Chairman and interim Chief Financial Officer.

After relatively brief negotiations with Icahn that Rossiter led for Lear, a deal was struck giving AREP the right to buy Lear for $36 per share in a merger, subject to the approval of the Lear stockholders. Although the price was only a 3.8% premium to the closing price before AREP's first public bid, it was a substantial 46.4% premium over the price of Lear's stock on the date when Icahn had substantially increased his share of Lear equity in October 2006, an event which started a run-up in Lear's trading price. Indeed, when Icahn first bought into Lear in March 2006, its shares were trading in the $16 to $17 range.

The deal provided for a post-signing market check. For 45 days, Lear was free to shop the deal, and it did so, contacting 41 potential buyers. None made an offer, even though a topping bidder making a bid after the go-shop period expired only faced the obligation to pay AREP a termination fee equal to 2.4% of Lear's enterprise value. If a rival bidder had gotten its act together and outbid AREP during the go-shop period, it only faced a termination fee equal to 1.9% of Lear's enterprise value. Although 45 days was a tight time frame, other factors suggested that interested bidders would have been studying Lear, factors that included Lear's status as one of the 150 largest corporations in the United States, its December 2004 elimination of its poison pill, Icahn's investments and reputation as a willing seller when the price was right, and the sharp run-up in its stock. Indeed, in the Original Merger Agreement, Icahn pledged to vote AREP's shares in favor of any alternative, higher-priced deal approved by the Lear board. AREP did have a match right, but if a bidder bid more than $37 per share, AREP had only one chance to use it.

### C. *The Preliminary Injunction Proceedings*

When the $36 per share Original Merger Agreement became public, this suit was filed, and the plaintiffs sought a preliminary injunction. Their motion was grounded in two major concerns: 1) that the proxy statement was materially misleading; and 2) that the Lear board had not satisfied its duty, under *Revlon*,[7] to take reasonable steps to obtain the highest price reasonably available.

That motion was largely denied. As to the *Revlon* claim, the court found that the plaintiffs had not established a reasonable probability of success on the merits because the overall process used by the Lear board was one reasonably designed to get the best price. In particular, the court noted the wide flexibility given to the Lear board to shop the deal after signing and

---

**7.** *Revlon, Inc. v. MacAndrews & Forbes Hold-* *ings, Inc.,* 506 A.2d 173 (Del.1986).

the modest barriers the deal protections presented to any serious bidder.[8] Likewise, the court observed that Lear had retained two reputable financial advisors, both of whom had presented the board with valuation information suggesting that the $36 offer was attractive in light of the company's earnings outlook. Thus, in summary the court stated:

> The Lear board had sufficient evidence to conclude that it was better to accept $36 if a topping bid did not emerge than to risk having Lear's stock price return to the level that existed before the market drew the conclusion that Lear would be sold because Icahn had bought such a substantial stake. Putting aside the market check, the $36 per share price appears as a reasonable one on this record, when traditional measures of valuation, such as the DCF, are considered. More important, however, is that the $36 price has been and is still being subjected to a real world market check, which is unimpeded by bid-deterring factors.[9]

But, in one important respect, the court did grant the plaintiffs' motion. The proxy statement had not informed Lear stockholders of Rossiter's concerns over securing his retirement and the fact that the company had engaged an executive compensation consultant to study options to help Rossiter monetize a material portion of his retirement funds while remaining CEO. The court felt that this information was material because Rossiter had taken the lead in negotiations with Icahn for Lear. Because Rossiter's retirement benefits were so large, and because the deal with Icahn ultimately resulted in an agreement whereby Rossiter could receive his

"SERP"[10] within two years and still remain Lear's CEO, the court concluded that the Lear stockholders were entitled to know the material facts regarding these matters.[11]

### D. The Proxy Solicitation Process And Revised Merger Agreement

After this court's decision, Lear ran into resistance in securing votes for the Merger, which was scheduled for a vote on June 27, 2007. Three proxy voting advisory services, ISS, Glass Lewis & Co., and Proxy Governance, recommended that Lear stockholders vote against the Merger, and a large public pension fund expressed opposition to the deal.

On June 21, a meeting of the "Special Committee" of the Lear board met to review the company's proxy solicitation effort. The Special Committee had been formed so that a group of the board could meet on short notice to address emerging issues during the deal process. The Committee had not been formed because the Lear board was comprised largely of management or conflicted directors.[12] To the contrary, of the eleven Lear directors, only one was affiliated with Icahn, Vincent Intrieri, and he recused himself from all material involvement in the deal process. Two directors were members of management, Rossiter and Vandenberghe. The other eight directors are considered independent under the criteria of the NYSE, and the plaintiffs did not challenge their independence in arguing their preliminary injunction motion.

At the June 21 meeting, Lear's General Counsel, Daniel Ninivaggi, reported that

---

8. *Lear,* 926 A.2d at 119–20.

9. *Id.* at 122–23.

10. SERP is the acronym for Supplemental Executive Retirement Plan.

11. *Lear,* 926 A.2d at 113–15.

12. *Id.* at 102.

the company was having mixed results in seeking support for the Merger, and he advised delaying the June 27 vote until July 12 to give the company more time to seek support. The Special Committee agreed.

At a meeting on June 28, the Special Committee again considered the status of the company's efforts to secure approval of the Merger. Ninivaggi told the members that management and the Committee's advisors, who included the proxy solicitation firm of MacKenzie Partners, had met with most of the company's 50 largest stockholders, that their reaction continued to be mixed, and that " 'many [stockholders] thought improved transaction terms were warranted.' "[13] In a passage from the meeting minutes that the plaintiffs block quote in the complaint, Ninivaggi is reported as having shared the following opinion:

> [B]ased on comments received from shareholders and advice from the Company's proxy solicitor, MacKenzie Partners ... and the Company's financial advisors [JPMorgan and Evercore Partners], the per share consideration would need to be increased by *at least* $1.00 per share for the merger to be approved by the shareholders.... MacKenzie believed that for the Initial Merger Agreement to receive the recommendation of ... ISS ..., an improvement in the consideration of between $1.50 and $2.00 per share *may be* required.[14]

Based on this information and the knowledge that the submitted proxies as of June 27 were running more against than for the Merger, the Special Committee decided to authorize its Chairman, Larry McCurdy, and the company's CEO, Rossiter, to work together to negotiate improved terms from Icahn, who as of that time was publicly stating that AREP would not improve its offer. The Special Committee's charge to McCurdy appears to have been responsive to concerns raised in the preliminary injunction decision about the absence of Special Committee presence during the negotiations, given Rossiter's concerns about his retirement funds.[15] Thus, the Special Committee acted to preserve the value of having Rossiter's knowledge and experience at the bargaining table by keeping him there, but with the Committee's chair also present and active.

During the next ten days or so, the negotiators for Lear engaged Icahn in extensive negotiations over whether and how the Original Merger Agreement might be amended in a manner that would attract more stockholder support. Among the options that were vetted were: 1) the possibility that AREP might be joined by another equity partner, resulting in a higher joint bid; 2) the possibility of offering Lear stockholders an equity stub along with the cash consideration, which would give them a continuing interest in Lear; and 3) a straight-forward price increase from AREP.[16]

As the complaint sets forth, the option of a stub equity was essentially nixed by Icahn because AREP was unwilling to incur all the risks attendant to the two-month delay that would have resulted had the transaction been changed from an all-cash deal to one involving the issuance of a public equity stub.[17] Moreover, the complaint's silence on the subject suggests

---

13. Compl. ¶ 170 (quoting June 28, 2007 Special Committee minutes).

14. *Id.* (emphasis added).

15. *See Lear*, 926 A.2d at 117.

16. *Id.* at ¶¶ 172–176.

17. *Id.* at ¶ 179.

that the first option, of an additional equity partner, never bore fruit.

Instead, the negotiations centered on the last option: whether AREP would simply raise its bid. From the get-go, the complaint suggests, Icahn demanded that AREP be compensated for an increased offer, in the form of a termination fee that would be payable in the event the Lear stockholders rejected the sweetened overture.[18] Icahn also wanted Lear to demonstrate meaningful stockholder support for a deal at an improved price. After discussions with certain stockholders, including one of the plaintiffs in this case,[19] Ninivaggi reported to Icahn that a price bump of only $1.00 per share would likely be insufficient in itself, and Icahn raised the possibility of adding a public equity stub.[20] For the reason noted, the public equity stub option was later taken off the table, and the parties haggled over a simple price adjustment.

Eventually, Lear's negotiators extracted another 25 cents per share from AREP. In exchange, AREP got a "No–Vote Termination Fee" of $25 million. That is, AREP received a promise that it would get consideration valued at $25 million if the Lear stockholders rejected the Revised Merger Agreement. Half of the Fee was payable in cash. The other half was comprised of 335,570 shares of Lear stock, then having a

value of $12.5 million. The Fee was payable if the Lear stockholders rejected the Merger for any reason. But, the amount of the Fee would be subtracted from the total amount due to AREP if, as contemplated by the "Original Termination Fee," Lear were to engage in an alternative transaction within 12 months of the termination of the Revised Merger Agreement due to a failure of the Lear stockholders to approve the Merger with AREP.

On July 8, the Lear board approved the Revised Merger Agreement on these terms. As of that time, the board's advisors could not be certain that the stockholders would favor the revised deal or that the revised deal would have the support of ISS, the influential proxy advisory service. As of then, Lear's efforts—which included regular contact with McKenzie and ISS—had not borne fruit. When Lear gave ISS a heads-up on July 7 about what was likely coming, and ISS expressed concern about the absence of an equity stub, Lear encouraged ISS to speak directly to Icahn about that subject.

On July 9, Lear filed the Supplemental Proxy explaining the terms of the Revised Merger Agreement and the process leading up to it and indicating that the July 12 meeting would be convened but immediately adjourned to July 16 to give the company more time to solicit proxies. But

---

18. *Id.* at ¶¶ 174, 176. The plaintiffs quote selectively from the portion of the Supplemental Proxy addressing these events. As to this specific issue, that statement indicates that Icahn initially demanded a "No–Vote Termination Fee" of between $28 and $42 million plus expenses. Lear Defs.' Opening Br. Ex. B ("Supplemental Proxy") at S–7.

19. Plaintiff Classic Fund supposedly "flatly rejected any settlement for a $1.25 per share increase in consideration." Compl. ¶ 177. In the previous iteration of the complaint, this sentence read "On July 2, 2007, Classic Fund flatly rejected any settlement for a $1 per-

share increase in consideration." Third Am. Compl. ¶ 191. Notably, this is a reference to an offer to settle this litigation, not simply a question about whether Classic Fund would vote for a merger at a price $1.25 per share higher. Also, the $1.00 figure cited in the previous complaint fits better with the chronology recited in the current complaint, as the next paragraph refers to Ninivaggi telling Icahn that a $1.00 per share increase would likely not be enough. In any event, this detail is not material to the outcome of this motion.

20. Compl. ¶ 178.

the very next day ISS reiterated its previous negative recommendation, questioned Lear's refusal to demand a stub equity feature, and suggested that Lear stockholders were better off holding on to their shares and reaping the benefits expected from the company's internal restructuring efforts. In particular, ISS "wonder[ed] why" the board agreed to what ISS saw as the unusual step of affording AREP a break-up fee in exchange for a sweetened offer in light of the fact that in certain other deals, bidders had upped their bids in order to obtain stockholder approval without demanding a quid pro quo.[21]

On July 16, the vote on the Revised Merger Agreement was held. The Lear stockholders rejected it, with slightly over 50% of the Lear shares voting no.

### E. The Effect Of The Negative Merger Vote On This Litigation

Originally, this case involved claims that the Lear board had breached its fiduciary duties by failing to comply with its *Revlon* duties and to disclose all material facts in seeking approval of the Merger. When the Revised Merger Agreement was defeated, the plaintiffs dropped these claims, and they were dismissed as moot.[22]

But, the plaintiffs continued this suit by amending their complaint to attempt to state derivative claims against not only the Lear directors, but also AREP. These claims are grounded in the theory that the Lear board breached its fiduciary duties by granting AREP the No–Vote Termination Fee in exchange for the $1.25 per share increase in its offer. Complement-ing the fiduciary duty count are derivative counts alleging that AREP aided and abetted this supposed breach of fiduciary duty and was unjustly enriched by the No–Vote Termination Fee.

After the plaintiffs filed their pleading in its current form, the defendants moved to dismiss.

### III. Legal Analysis

### A. Plaintiffs' Claim That The Lear Directors Breached Their Duty Of Loyalty By Approving The Revised Merger Agreement In Bad Faith

■■■ Because this is a derivative action and the plaintiffs failed to make a demand, the plaintiffs must meet the heightened pleading standard set forth in *Aronson v. Lewis.*[23] To plead demand futility under *Aronson*, the plaintiffs must allege particularized facts creating a reasonable doubt that: 1) a majority of the board are disinterested or independent; or 2) the transaction was the product of a valid exercise of business judgment.[24]

The plaintiffs have eschewed any attempt to satisfy the first prong of *Aronson*, and they attempt to sustain their complaint by contending that it pleads particularized facts stating a non-exculpated breach of fiduciary duty by the Lear board and thus satisfies the second prong of *Aronson*. To meet their burden under *Aronson*, the plaintiffs cannot rely on conclusory allegations, they must plead specific facts that support the inference that the Lear directors breached their fiduciary duty of loyalty.[25]

---

21. *Id.* at ¶ 186.

22. The plaintiffs were awarded attorneys fees and expenses for the benefits produced by their preliminary injunction motion.

23. 473 A.2d 805 (Del.1984).

24. *Id.* at 814.

25. *See Brehm v. Eisner*, 746 A.2d 244, 254 (Del.2000) ("[Demand futility] is not satisfied by conclusory statements ... [w]hat the pleader must set forth are particularized factual statements that are essential to the claim."); *Guttman v. Huang*, 823 A.2d 492, 499 (Del.Ch.2003) ("[The court] cannot accept cursory contentions of wrongdoing as a

That is, because the Lear charter contains an exculpatory provision authorized by § 102(b)(7), the plaintiffs cannot sustain their complaint even by pleading facts supporting an inference of gross negligence; they must plead a non-exculpated claim.[26] In this case, what is critical is that they plead facts suggesting that the Lear directors breached their duty of loyalty by somehow acting in bad faith for reasons inimical to the best interests of the Lear stockholders.

Recognizing this, the plaintiffs have grounded their resistance to the defendants' dismissal motion on a bad faith theory. According to the plaintiffs, the Lear directors acted in bad faith primarily because they supposedly agreed to the No–Vote Termination Fee while knowing that the $1.25 per share price increase would likely not be sufficient to attract a majority vote in favor of the Revised Merger Agreement. Thus, the directors' "conduct amounted to a bad faith abdication of fiduciary duties, and resulted in the Company's entry into a transaction that was tantamount to corporate waste."[27] Even more aggressively, the plaintiffs contend that the Lear board's collective ear was so closed to the views of Lear stockholders that its decision to grant the No–Vote Termination Fee in this context "has all the badges of the exercise of no care."[28]

In reaction to the defendants' argument that they reasonably "believed the Revised Merger Agreement was a good one, and should have been approved by the Company's shareholders,"[29] the plaintiffs advance this remarkable argument:

> The question presented is *not* whether the shareholders *should* have followed the recommendation of the Special Committee and the Company's insiders and approved the Revised Merger Agreement. Rather, it was whether there was *any reasonable chance* of the Company obtaining such approval, and thus avoiding the give away to Icahn of the $25 million No Vote [Termination Fee]. Under the well and specifically pled facts in the Complaint, the answer to that question is no.[30]

The plaintiffs buttress this argument with the idea that the independent directors acted with bad faith in permitting Rossiter and Ninivaggi to play leading roles in negotiating the Revised Merger Agreement because Rossiter and Ninivaggi arguably stood to benefit from greater economic security if the Revised Merger Agreement were approved by the stockholders than if Lear remained independent.[31]

For the following reasons, I conclude that these arguments are unpersuasive and that the complaint must be dismissed.

substitute for the pleading of particularized facts.").

**26.** *See Guttman,* 823 A.2d at 501 (Del.Ch. 2003) ("[I]n the event that the charter insulates the directors from liability for breaches of the duty of care, then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts.") (citation omitted). This is necessary to protect the exculpatory provision's "guarantee that the defendant directors do not suffer discovery or a trial simply because the plaintiffs have stated a non-cognizable damages claim for a breach of the duty of care." *McMillan*

*v. Intercargo Corp.,* 768 A.2d 492, 501–02 (Del.Ch.2000). To do otherwise would "strip away a large measure of the protection the General Assembly has accorded directors through its enactment of [§ 102(b)(7) ]." *Id.* at 502.

**27.** Pls.' Br. at 15.

**28.** *Id.* at 19 (emphasis omitted).

**29.** *Id.* at 18.

**30.** *Id.* (emphasis in original).

**31.** Compl. ¶ 189; Pls.' Br. at 8.

For starters, the complaint does not come close to alleging that the board failed to employ a rational process in considering whether to approve the Revised Merger Agreement. Noticeably absent from the complaint are allegations that the Special Committee and board failed to meet on a regular basis to consider developments in the negotiation and proxy solicitation process. In fact, the complaint itself suggests the opposite: that the Special Committee and full board met regularly to discuss material developments and how to proceed in light of them.[32] Likewise, the complaint does not allege that the Special Committee and board were proceeding without the advice of professional advisors. And for good reason. The complaint itself indicates the reality, which is that the Lear directors received financial advice from not one, but two reputable sources, JPMorgan and Evercore Partners,[33] legal advice from a large law firm, and advice about the proxy solicitation process from a leading firm, MacKenzie Partners.[34] Put bluntly, the complaint would not state a claim for lack of due care even if simple negligence were the applicable standard.

Moreover, although the complaint contains cursory allegations that the board did not have a basis for concluding that the Revised Merger Agreement was financially advantageous to the Lear stockholders, and thus that the board knew that the $37.25 per share deal was "unfair," those allegations are unsupported by the pled facts.[35] The complaint itself (and the Supplemental Proxy, which it refers to repeatedly) makes clear that the board received advice from JPMorgan and Evercore that the Revised Merger Agreement was fair to the Lear stockholders in view of the future earnings potential of the firm as of the time the board approved the Revised Merger Agreement.[36] As important, the board knew that the company had been freely shopped and that no bidder had come up with a better offer, during the foamiest peak of what everyone was then calling a "frothy" M & A market. In that regard, Lear, one of the nation's largest corporations with over $17.5 billion in revenues and with 76 million shares freely trading on the NYSE, was not the sort of company that hungry capitalists were likely to overlook. Indeed, the large run-up in Lear's stock

---

**32.** *See* Compl. ¶¶ 161, 163–84 (detailing frequent meetings between June 14 and July 8 and the advice or reports received during them); *see also* Supplemental Proxy at S–6 to S–11 (describing eleven meetings of the Special Committee or the full board between June 14 and July 8 where the directors received advice from their financial, legal, or proxy solicitation advisors, updates on the solicitation process, or updates on the status of negotiations with AREP).

**33.** Compl. ¶¶ 161, 167.

**34.** *Id.* at ¶¶ 160, 170, 180–82.

**35.** *Id.* at ¶¶ 12, 189, 201.

**36.** The complaint block quotes the following description from the Supplemental Proxy of the advice the Special Committee received from its advisors:

> At the meeting of the special committee on June 17, 2007, the financial advisors to the special committee, JPMorgan and Evercore Partners, provided the special committee with their evaluation of the Company's revised financial outlook. At that meeting, the special committee was informed by JPMorgan that the Company's revised 2007 financial forecast would not materially change JPMorgan's prior financial analysis. A representative of Evercore stated to the special committee that, notwithstanding the Company's revised 2007 financial outlook, he was not aware of any fundamental change in the North American automotive industry environment since February 2007 that would have an impact on the Company.
>
> *Id.* at ¶ 161.

that had followed public word of Icahn's deepening investment suggested just the opposite. Although the complaint cites ISS to the effect that directors had no reasonable basis to fear that a rejection of the Merger might result in harm to the Lear stockholders in view of Lear's restructuring plan, Lear's trading price had been far lower than $37.25 before Icahn came on the scene and gave the market the hope of an M & A transaction. In sum, the complaint pleads no particularized facts supporting the conclusion that the board approved the $37.25 per share price in bad faith.

Given the realities that the board was comprised of a super-majority of independent directors, used a thorough process to consider whether to approve the Revised Merger Agreement, and had a solid financial basis to conclude that the $37.25 per share price remained attractive, the plaintiffs are left grasping for some theory to buttress an inference that the board breached its fiduciary duty of loyalty.

They begin by adopting the same theory that they advanced in support of their original motion for a preliminary injunction, which is that Rossiter's desire to secure his retirement nest egg while remaining CEO gave him an incentive to favor a deal with Icahn at a less than an optimal price. Rather than risk holding out to get the best price and put his large retirement stake in jeopardy if Icahn walked away, Rossiter might, the plaintiffs' theory went, be less than fully vigorous as a negotiator and leave some money in Icahn's pocket. And this theory, in my view, did have enough economic substance, that it warranted a disclosure remedy informing Lear stockholders of Rossiter's personal financial interests and desire to secure his retirement stake.[37]

But when it became apparent that the original $36 deal would not find favor with Lear stockholders, the equation for Rossiter changed in a way that does not aid the plaintiffs' current theory. Only if Rossiter could extract from Icahn a better bid that would attract stockholder support would Rossiter achieve the enhanced financial security a merger with AREP promised him. A failed deal did nothing to advance that goal. To the extent Rossiter therefore wanted to get a deal done, he had a strong incentive to push Icahn to make the biggest bump possible. Furthermore, in seeking that adjustment, Rossiter found himself in this round of the negotiations accompanied by the Special Committee's Chairman McCurdy, whose independence has not been questioned by the plaintiffs.

Whither the bad faith? This supposedly comes in because the board knew that a $1.25 per share increase would not cut it with stockholders, rendering the Revised Merger Agreement pure corporate waste that simply gifted AREP a $25 million termination fee.

But this argument is not the stuff of which viable derivative complaints are made.

Taken on its own terms, the argument is not even supported by the complaint itself. Although the plaintiffs sometimes say that the board knew for certain that $1.25 per share would not suffice to attract stockholder approval, the complaint and the plaintiffs' brief equivocates. Thus, the plaintiffs' use words of uncertainty about the board's certain knowledge of defeat, stating that defeat was "almost certain," "near certain[ ]," "all but certain," and "all but inevitable."[38] The plaintiffs therefore concede that there was a chance of victory.

37. *Lear,* 926 A.2d, at 114–15.

38. Compl. ¶ 9; Pls.' Br. at 9, 10, 15, 19, 20.

Indeed, the complaint's pled facts are consistent with the possibility of victory. As noted, the complaint relies heavily upon the fact that the board was advised that MacKenzie "believed" a price increase of $1.50 to $2.00 per share "may be required" to get an affirmative recommendation from ISS, and that Ninivaggi advised the board that a price increase of "at least $1.00 per share" would be necessary to get stockholder approval.[39] It also notes that one of the plaintiffs rejected a litigation settlement offer of $1.25 per share.[40]

These pled facts reflect uncertainty in an ongoing game of financial chicken. Institutional investors do not have to be sworn as witnesses and give their reservation prices to merger targets soliciting proxies. They can and do play it cagey and attempt to extract value. Firms like MacKenzie are paid to peer into this murk and make sense of it, so as to estimate what it will ultimately take to get the votes. And the incentives of a firm like ISS also give it reason to play coy. In order to demonstrate its value and clout to its customers, ISS has an incentive to act as a quasi-negotiator, using the proxy solicitation process as a way to encourage a higher bid, and using its recommendation tool to extract value.

The complaint fairly pleads facts that suggest that a price increase of $1.25 per share was not sure to be enough. But it falls far short of pleading facts that support a rational inference that a price increase of $1.25 per share had no possibility of carrying the day. Indeed, the complaint's authors lack the fortitude to make that claim, thus explaining their repeated equivocations. Even on their own terms, $1.25 was above the $1.00 Ninivaggi reported *might* be required and within a quarter per share of the $1.50 the board was told that ISS *might* need to give approval.[41] These prosciutto-thin margins are indicative of tough end-game posturing, not a huge value chasm.

Thus, the plaintiffs are in reality down to the argument that the Lear board did not make a prudent judgment about the possibility of future success. That is, the plaintiffs are making precisely the kind of argument precluded by the business judgment rule.[42] Precisely so as to ensure that directors are not unduly hampered in taking good faith risks, our law eschews the use of a simple negligence standard. Even where it is possible to hold directors responsible for a breach of the duty of care, Delaware law requires that directors have acted with gross negligence.[43] Unless judges are mindful of the substantial difference between a simple negligence and

39. Compl. ¶ 170.

40. *Id.* at ¶ 177.

41. *Id.* at ¶ 170.

42. Under the business judgment rule, "directors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process...." *Brehm*, 746 A.2d at 264 n. 66. *See also* Stephen M. Bainbridge, *The Business Judgment Rules As Abstention Doctrine*, 57

VAND. L. REV 83, 127–28 (2004); E. Norman Veasey & Christine T. Di Gugliemo, *What Happened in Delaware Corporate Law and Governance From 1992–2004? A Retrospective on Some Key Developments*, 153 U. PA. L. REV. 1399, 1421–28 (2005) (["Professor Bainbridge's] approach is consistent with the Delaware doctrine that the [business judgment] rule is a presumption that courts will not interfere with, or second-guess, decision making by directors.").

43. *Aronson*, 473 A.2d at 812 (Del.1984) ("[U]nder the business judgment rule director liability is predicated upon concepts of gross negligence.").

gross negligence standard,[44] the policy purpose served by Delaware's choice of a gross negligence standard risks being undermined. The definition of gross negligence used in our corporate law jurisprudence is extremely stringent.[45]

Here, it is critically important that another substantial dividing line be respected. After *Van Gorkom* [46] met an unenthusiastic reception, the General Assembly adopted § 102(b)(7), authorizing corporations to exculpate their directors from liability for violations of the duty of care. Lear's charter contains such an exculpatory charter provision.

To respect this authorized policy choice made by Lear and its stockholders, this court must be vigilant in reviewing the complaint here to make sure that it pleads particularized facts pleading a non-excul-

pated breach of fiduciary duty. That requires the plaintiffs to plead particularized facts supporting an inference that the directors committed a breach of the fiduciary duty of loyalty.[47] More specifically here, because the plaintiffs concede that eight of the eleven Lear directors were independent, the plaintiffs must plead facts supporting an inference that the Lear board, despite having no financial motive to injure Lear or its stockholders, acted in bad faith to approve the Revised Merger Agreement. Such a claim cannot rest on facts that simply support the notion that the directors made an unreasonable or even grossly unreasonable judgment. Rather, it must rest on facts that support a fair inference that the directors consciously acted in a manner contrary to the interests of Lear and its stockholders.[48]

---

**44.** The difference is a stark one, which some decisions—most notably *Smith v. Van Gorkom*, 488 A.2d 858 (Del.1985)—blur. In the important body of law governing the liability of government officials for discretionary actions, a gross negligence standard is often used for purposes akin to that served by the business judgment rule. *E.g.*, DEL.CODE ANN. tit. 10, § 4001 (1999) (immunizing public officials from civil suit for actions arising from official duties and "done without gross or wanton negligence"); *see also* COLO. REV. STAT § 24–10–118(2)(a) (1999) (requiring an even higher standard of "willful or wanton" behavior for the imposition of liability against government employees).

**45.** *See Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *12 (Del.Ch. Apr. 5, 1990); ("[G]ross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason.") (internal quotations omitted); *Solash v. Telex Corp.*, 1988 WL 3587, at *9 (Del.Ch. Jan. 19, 1988) (to be grossly negligent, a "decision has to be so grossly off-the-mark as to amount to 'reckless indifference' or a 'gross abuse of discretion' "); *see also* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of Standards of Review in Delaware*, 56 BUS. LAW. 1287, 1299–1305

(2001). Indeed, the definition is so strict that it imports the concept of recklessness into the gross negligence standard, thus conflating two standards that are distinct when used in the criminal law concept. *See, e.g.*, Model Penal Code § 2.02 (1962).

**46.** *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985).

**47.** *Malpiede*, 780 A.2d at 1094; *see also Intercargo*, 768 A.2d at 495 ("[T]he plaintiffs may survive this motion only if the complaint contains well-pleaded allegations that the defendant directors breached their duty of loyalty by engaging in intentional, bad faith, or self-interested conduct that is not immunized by the exculpatory charter provision.").

**48.** *Integrated Health Services, Inc. v. Elkins*, 2004 WL 1949290, at *12 (Del.Ch. Aug. 24, 2004) ("[I]t is important to highlight yet again that the [*Disney*] standard moves beyond gross negligence. To survive a motion to dismiss based on this standard, where the charter contains a § 102(b)(7) provision, a plaintiff must plead facts that, if true, would imply that a Board 'consciously and intentionally disregarded [its] responsibilities.' ") (quoting *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 289 (Del.Ch.2003)).

The plaintiffs recognize this reality, and have attempted to sustain their complaint by charging the Lear board with having acted with "no care"[49] and having approved in "bad faith"[50] a Revised Merger Agreement that was almost certain not to be approved, while supposedly knowing that the $37.25 price was unfair. But they plead no particularized facts that support these inflammatory and conclusory charges of wrongdoing.

In fact, the very need of the plaintiffs to take legal doctrine that arose in the very different monitoring context and try to apply it to a discrete transaction that was subject to almost daily board attention suggests their desperation. The line of cases running from *Graham v. Allis–Chalmers*[51] to *Caremark*[52] to *Guttman*[53] to *Stone v. Ritter*[54] dealt in large measure with what is arguably the hardest question in corporation law: what is the standard of liability to apply to independent directors with no motive to injure the corporation when they are accused of indolence in monitoring the corporation's compliance with its legal responsibilities? The question is difficult for many reasons, including the reality that even the most diligent board cannot guarantee that an entire or-ganization will always comply with the law. But it must be answered because one of the central justifications for the use of independent directors is that they are well positioned to oversee management, particularly by monitoring the processes used by the corporation to accurately account for its financial affairs and comply with applicable laws.[55] When a fiduciary takes on a paying role, her duty of loyalty requires that she make a good faith effort to carry out those duties.[56] Although everyone has off days, fidelity to one's duty is inconsistent with persistent shirking and conscious inattention to duty.[57] For this reason, *Caremark* and its progeny have held that directors can be held culpable in the monitoring context if they breach their duty of loyalty by "a sustained or systematic failure ... to exercise oversight,"[58] or "were conscious of the fact that they were not doing their jobs [as monitors]."[59] More generally, our Supreme Court has held that to hold a disinterested director liable for a breach of the fiduciary duty of loyalty for acting in bad faith, a strong showing of misconduct must be made. Thus, in its *Disney* decision, the Supreme Court enumerated examples that all depended on purposeful wrongdoing, such as intention-

**49.** Pls.' Br. at 19 (emphasis omitted).

**50.** *Id.* at 15.

**51.** *Graham v. Allis–Chalmers Mfg. Co.,* 188 A.2d 125 (Del.1963).

**52.** *In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d 959 (Del.Ch.1996).

**53.** *Guttman v. Huang,* 823 A.2d 492 (Del.Ch. 2003).

**54.** *Stone v. Ritter,* 911 A.2d 362 (Del.2006).

**55.** *See e.g.,* Melvin Eisenberg, *The Board Of Directors And Internal Control,* 19 Card. L. Rev. 237, 244–50 (1997).

**56.** *ATR–Kim Eng Financial Corp. v. Araneta,* 2006 WL 3783520, at *19–21 (Del.Ch.2006)

("One cannot accept the important role of director in a Delaware corporation and thereafter consciously avoid any attempt to carry out one's duties.").

**57.** *Teachers' Retirement System of Louisiana v. Aidinoff,* 900 A.2d 654 (Del.Ch.2006) ("[C]onscious torpor in the face of duty is disloyal behavior....").

**58.** *Caremark,* 698 A.2d at 971.

**59.** *Guttman,* 823 A.2d at 506; *see also Shaev Profit Sharing Account v. Armstrong,* 2006 WL 391931, at *5 (Del.Ch. Feb. 13, 2006) (duty of loyalty is breached when directors "utterly fail[] to exercise oversight of the corporation").

ally acting "with a purpose other than that of advancing the best interests of the corporation," acting "with the intent to violate applicable positive law," or "intentionally fail[ing] to act in the face of a known duty to act." [60]

The plaintiffs' invocation of this body of law in this case does not aid them. The complaint makes clear that the Lear board held regular meetings and received advice from several relevant experts. The plaintiffs have therefore not come close to pleading facts suggesting that the Lear directors "consciously and intentionally disregarded their responsibilities" and thereby breached their duty of loyalty.[61]

To this point, the plaintiffs' use of this body of law also makes clear the policy danger raised by transporting a doctrine rooted in the monitoring context and importing it into a context where a discrete transaction was approved by the board. When a discrete transaction is under consideration, a board will always face the question of how much process should be devoted to that transaction given its overall importance in light of the myriad of other decisions the board must make. Seizing specific opportunities is an important business skill, and that involves some measure of risk. Boards may have to choose between acting rapidly to seize a valuable opportunity without the luxury of months, or even weeks, of deliberation—such as a large premium offer—or losing it altogether. Likewise, a managerial commitment to timely decision making is likely to have systemic benefits but occasionally result in certain decisions being made that, with more time, might have come out differently. Courts should therefore be extremely chary about labeling what they perceive as deficiencies in the deliberations of an independent board majority over a discrete transaction as not merely negligence or even gross negligence, but as involving bad faith.[62] In the transactional context, a very extreme set of facts would seem to be required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disre-

**60.** *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del.2006).

**61.** *E.g., In re Tyson Foods S'holder Litig.*, 919 A.2d 563, 595 (Del.Ch.2007); *Disney*, 825 A.2d at 289.

**62.** Another risk warrants mention, which arises if courts fail to recognize that not all situations governed by *Revlon* have the strong sniff of disloyalty that was present in the original case. *Revlon* was a case rooted in entrenchment and bias concerns, with incumbent managers preferring one bidder strongly over another when a sale became inevitable. Many of the early *Revlon* and *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985), cases involved this flavor. When, as has become more common, a *Revlon* case simply involves the question of whether a board took enough time to market test a third-party, premium-generating deal, and there is no allegation of a self-interested bias against other bidders, a plaintiff seeking damages after the deal has closed cannot, in the presence of a § 102(b)(7) clause, rest on quibbles about due care. And, in that sort of scenario, the absence of an illicit directorial motive and the presence of a strong rationale for the decision taken (to secure the premium for stockholders) makes it difficult for a plaintiff to state a loyalty claim.

As this court has previously noted:
> The fact that a corporate board has decided to engage in a change of control transaction invoking so-called *Revlon* duties does not change the showing of culpability a plaintiff must make in order to hold the directors liable for monetary damages. For example, if a board unintentionally fails, as a result of gross negligence and not of bad faith or self-interest, to follow up on a materially higher bid and an exculpatory charter provision is in place, then the plaintiff will be barred from recovery, regardless of whether the board was in *Revlon*-land.

*Intercargo*, 768 A.2d at 502.

garding their duties.[63]   Where, as here, the board employed a special committee that met frequently, hired reputable advisors, and met frequently itself, a *Caremark*-based liability theory is untenable.

What would, of course, be more natural in this transaction-specific case would be the pleading of facts that suggest that the Lear directors had some bad faith motive to approve the Revised Merger Agreement. But the plaintiffs cannot do that as to eight of the eleven Lear directors. And Intrieri, the director affiliated with AREP, recused himself from the process.

The plaintiffs are thus left with two directors who they argue had an interest in seeing the Revised Merger Agreement approved: Rossiter and Vandenberghe. But the very fact that those directors wanted the Revised Merger Agreement approved undercuts the idea that the Lear board was on a lark. As noted, only if the stockholders approved the Revised Merger Agreement would Rossiter and Vandenberghe get the financial security afforded to them if that Agreement was implemented. More importantly, there are no facts pled suggesting that the independent board majority approved the Revised Merger Agreement for any reason other than the obvious one, that they thought it an attractive opportunity for the Lear stockholders in light of the company's future prospects and the absence of another topping bid after a full shopping process.

Recognizing that reality, the plaintiffs fault the Lear board, saying that even if the board believed that the Revised Merger Agreement was beneficial to the Lear stockholders, it breached its duty of loyalty by entering into that Agreement while knowing that approval of the Agreement was unlikely. This argument is grounded in a fundamental misunderstanding of the role of a director of a Delaware corporation. Directors are not thermometers, existing to register the ever-changing sentiments of stockholders. Directors are expected to use their own business judgment to advance the interests of the corporation and its stockholders. During their term of office, directors may take good faith actions that they believe will benefit stockholders, even if they realize that the stockholders do not agree with them.[64]   In the merger context, directors are free to adopt a merger agreement and seek stockholder approval if they believe that the stockholders will benefit upon adoption, even if they recognize that securing approval will be a formidable challenge.

It would be inconsistent with the business judgment rule for this court to sustain a complaint grounded in the concept that directors act disloyally if they adopt a merger agreement in good faith simply because stockholders might (?), were likely (?), or were almost certain (?) to reject it. This sort of speculative second-guessing may be good fun for sports talk shows or political pundits, but it is not the stuff of which duty of loyalty case law is made. In this vein, the notion that directors might face a loyalty claim for failing to secure the approval of a proxy advisory firm, such as ISS, before adopting a merger agreement is not one consistent with the tradition of our law. Such firms have no ownership stake in the corporation's shares and owe no duties to it. Their shifting sentiments

---

**63.** *See Disney,* 906 A.2d at 67.

**64.** *E.g., Mercier v. Inter–Tel (Del.) Inc.,* 929 A.2d 786 (Del.Ch.2007); *TW Services, Inc. v. SWT Acquisition Corp.,* 1989 WL 20290, at *8 n. 14 (Del.Ch. Mar. 2, 1989) ("[A] corporation is not a New England town meeting; directors, not shareholders, have responsibilities to manage the business and affairs of the corporation, subject however to a fiduciary obligation.").

are part of the business landscape boards must now address in seeking proxies, but directors who believe in good faith that a merger is good for the corporation's actual stockholders are entitled to push for its approval, irrespective of whether the merger is one that the proxy advisory firms might not ultimately favor.

To this last point, judicial notice can be taken of the fast moving developments in the financial markets in the summer of 2007, when the Lear Merger was rejected. In that same time period, on June 19, 2007, ISS recommended that the stockholders of Inter–Tel Corporation reject a cash merger. As recognition that the financial markets, and particularly the high-yield debt markets, were under stress came to the fore, the meeting on the Inter–Tel merger was delayed from June 29 until August 2. Before that rescheduled meeting, ISS changed its recommendation and the Inter–Tel merger was approved without a price change. With Lear's stock price now trading around $13 per share [65]—less than the range it was in before Icahn made his first purchases in March 2006—many Lear stockholders might wish they had taken the recommendation of their directors to accept $37.25 per share.[66] But why the Inter–Tel illustration is really relevant is because it illustrates the dynamism of capital markets and the imprudence of having a court sustain a loyalty claim, not on the basis of facts suggesting that the board approved a merger believing in bad faith that it was a poor deal, but simply because the stockholders were not likely to agree with the board's good faith determination that the merger was good for them.

## B.  *The Waste Claim*

The plaintiffs' argument that the Revised Merger Agreement involved corporate waste is frivolous.  The test for corporate waste is a stringent one and requires that the plaintiff plead "facts showing that no person of ordinary sound business judgment could view the benefits received in the transaction as a fair exchange for the consideration paid by the corporation." [67]  If given the facts pled in the complaint, "any reasonable person might conclude that the deal made sense, then the judicial inquiry ends." [68]  Here, AREP put another $100 million on the table in a situation where no topping bidder emerged.  It was obviously not waste for the Lear board to give the No–Vote Termination Fee as consideration for that higher-priced offer.  The plaintiffs' citation to ISS's perception that bidders other than Icahn had topped themselves for no consideration does not affect that reality. Each deal is different.  In the Original Merger Agreement, AREP only stood to receive the roughly $100 million break-up fee if Lear consummated an alternative transaction within a year.  Because AREP was bidding against itself, in effect, it was rational for Icahn to seek some increased compensation in the event of a no vote.  In this regard, it is notable that this court has approved termination fees contingent solely on a "naked no vote" of up to 1.4% of

**65.**  The court may take judicial notice of the trading price of a listed stock, *Weiss v. Samsonite Corp.*, 741 A.2d 366, 375 n. 26 (Del.Ch. 1999), *aff'd mem.*, 746 A.2d 277 (Del.1999), and the plaintiffs themselves have referred to Lear's market price in the complaint, *e.g.*, Compl. ¶¶ 65, 83.

**66.**  A more complete history of the Inter–Tel merger can be found in *Mercier v. Inter–Tel (Del.) Inc.*, 929 A.2d 786 (Del.Ch.2007).

**67.**  *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 892 (Del.Ch.1999) (internal quotations omitted).

**68.**  *Id.* (internal quotations omitted).

transaction value.[69] The No–Vote Termination Fee here constituted only 0.9% of deal value.

To call it waste for the Lear board to grant that modest fee in exchange for a substantial price increase would require a radical revision of the waste concept, converting it from a rigorous test designed to smoke out shady, bad faith deals to a license for judicial scrutiny of arm's length bargains. I hew to the traditional approach and will dismiss the waste claim.

### C. *The AREP Claims*

The plaintiffs have also sued AREP. In their complaint, the plaintiffs set forth counts for aiding and abetting breaches of fiduciary duty and unjust enrichment against AREP. But the complaint fails to plead facts to sustain these counts.

As for the aiding and abetting count, the complaint fails to plead a claim for breach of fiduciary duty, as noted previously, and also fails to plead any facts suggesting that AREP—which promised to pay another $1.25 per share or some $100 million—was knowingly complicit in any breach of fiduciary duty by seeking the No–Vote Termination Fee in exchange.[70] In fact, the complaint's facts demonstrate that the Revised Merger Agreement was the product of extensive negotiations and that AREP's representative on the Lear board did not play a role for Lear in the merger negotiation or approval process.[71]

Also, given that the No–Vote Termination Fee was created by a negotiated contract, the doctrine of unjust enrichment is inapplicable.[72] Moreover, for the same reasons as the complaint fails to plead facts supporting an inference that AREP was knowingly complicit in any breach of fiduciary duty, it also fails to support an inference that AREP was engaged in some form of wrongdoing.[73] Thus, the claims against AREP must be dismissed.

### IV. *Conclusion*

For the foregoing reasons, the Fourth Amended Complaint is dismissed in its entirety. IT IS SO ORDERED.

69. *H.F. Ahmanson & Co. v. Great Western Financial Corp.*, 1997 WL 305824, at *8 (Del. Ch. June 3, 1997).

70. To sustain an aiding and abetting claim, plaintiffs must plead: (1) the existence of a fiduciary relationship; (2) a breach of that relationship; and (3) knowing participation by the defendant in the fiduciary's breach. *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 989 (Del.Ch.2000).

71. Compl. ¶¶ 176–80.

72. *See Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *18 (Del.Ch. Oct.

10, 2006) ("When the complaint alleges an express, enforceable contract that controls the parties' relationship ... a claim for unjust enrichment will be dismissed.").

73. Under Delaware law, unjust enrichment requires an absence of justification for the transfer that enriches one party and impoverishes the other. *Palese v. Del. State Lottery Office*, 2006 WL 1875915, at *5 (Del.Ch. June 29, 2006). "That requirement usually entails some type of wrongdoing or mistake at the time of transfer." *Territory of U.S. V.I. v. Goldman, Sachs & Co.*, 937 A.2d 760, 796 n. 161 (Del.Ch.2007), *aff'd*, 2008 WL 2894840 (Del. July 29, 2008).