# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE ROUSE PROPERTIES, INC. FIDUCIARY LITIGATION | : : : : | **Consolidated** **C.A. No. 12194-VCS** |

## MEMORANDUM OPINION

Date Submitted:  December 19, 2017
Date Decided:  March 9, 2018

Stuart M. Grant, Esquire, Cynthia A. Calder, Esquire, Nathan A. Cook, Esquire and Michael T. Manuel, Esquire of Grant & Eisenhofer P.A., Wilmington, Delaware and Jason M. Leviton, Esquire and Bradley Vettraino, Esquire of Block & Leviton LLP, Boston, Massachusetts, Attorneys for Plaintiffs.

Stephen C. Norman, Esquire, Kevin R. Shannon, Esquire and Jaclyn C. Levy, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Andrew W. Stern, Esquire, Jon W. Muenz, Esquire and Leah R. Milbauer, Esquire of Sidley Austin LLP, New York, New York, Attorneys for Individual Defendants.

Kevin G. Abrams, Esquire, Daniel R. Ciarrocki, Esquire and Matthew L. Miller, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware and John A. Neuwirth, Esquire, Seth Goodchild, Esquire, Evert J. Christensen, Jr., Esquire and Matthew S. Connors, Esquire of Weil, Gotshal & Manges LLP, New York, New York, Attorneys for Brookfield Defendants.

**SLIGHTS, Vice Chancellor**

Plaintiffs, two stockholders of non-party Rouse Properties Inc. ("Rouse" or the "Company"), seek to recover damages on behalf of a putative class of Rouse stockholders for alleged breaches of fiduciary duty by Rouse's directors and its 33.5% shareholder, a collective of companies affiliated with Brookfield Asset Management, Inc. (collectively referred to as "Brookfield"), arising out of Rouse's merger with Brookfield. In January 2016, Brookfield made an offer to acquire all of Rouse's non-Brookfield shares for $17 per share cash. In response, Rouse formed a special committee of non-Brookfield directors to negotiate with Brookfield and consider other strategic alternatives.

The special committee hired legal and financial advisors and negotiated with Brookfield for several weeks. The parties eventually arrived at a price of $18.25 per share and thereafter signed a merger agreement on February 25, 2016 (the "Merger Agreement").[1] Both the special committee and the board voted to approve the offer and the Company presented the proposed transaction to the Rouse shareholders for approval. Plaintiffs filed their original complaint prior to the stockholder vote along with motions to expedite and preliminarily to enjoin the transaction. The Court declined to grant the motion to expedite because Plaintiffs failed to identify any

---

[1] The Merger Agreement contemplated that the Brookfield affiliates with ownership stakes in Rouse would first exchange their Rouse stock for newly issued Rouse Series I preferred stock, then a newly created Brookfield affiliate would merge into Rouse with Rouse remaining as the surviving company (the "Merger").

1

prospect of a superior proposal or any basis to infer that the stockholder vote on the Merger would be uninformed or coerced. On June 23, 2016, 82.44% of Rouse's unaffiliated shares voted in favor of the Merger and the transaction closed days later.[2]

Plaintiffs' Amended Complaint for post-closing damages (the "Complaint") alleges that the Merger is a product of breaches of fiduciary duties by Rouse's special committee and Rouse's controlling stockholder, Brookfield.[3] Alternatively, as to Brookfield, Plaintiffs allege that it aided and abetted the special committee's breaches.

In this post-*Corwin*,[4] post-*MFW*[5] world, a pattern has emerged in post-closing challenges to corporate acquisitions (whether by merger or tender offer) where a less-than-majority blockholder sits on either side of the transaction, but the corporation in which the blockholder owns shares does not recognize him as a

---

[2] Rouse Form 8-K, June 6, 2016 at 2.

[3] The post-closing Complaint alleges for the first time that the disclosures relating to the Merger were materially inadequate in a manner that caused the stockholder vote approving the Merger to be uninformed. These allegations appear more to anticipate an affirmative ratification defense than to support an affirmative breach of fiduciary duty claim.

[4] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980 (Del. Ch. 2014), *aff'd sub nom.*, *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[5] *In re MFW S'holders Litig.*, 67 A.3d 496 (Del. Ch. 2013), *aff'd sub nom.*, *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

controlling stockholder and does not, therefore, attempt to neutralize his presumptively coercive influence. The pattern, in its simplest form, consists of two elements: (1) the stockholder plaintiff pleads facts in hopes of supporting a reasonable inference that the minority blockholder is actually a controlling stockholder such that the *MFW* paradigm is implicated and the *Corwin* paradigm is not[6]; and (2) failing that, the plaintiff pleads facts in hopes of supporting a reasonable inference that the stockholder vote was uninformed or coerced such that *Corwin* does not apply.[7] Under our settled law, these are two cleared pathways to avoid pleading-

---

[6] *M&F Worldwide*, 88 A.3d at 644 (holding that "business judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders"); *Corwin,* 125 A.3d at 312 (holding that a board's approval of a transaction "not subject to the entire fairness standard" will be reviewed under the business judgment rule when approved by "a fully informed, uncoerced [majority] stockholder vote"). Of course, when the corporation in which the minority blockholder owns shares does not recognize that blockholder as a controlling stockholder, its board of directors has no incentive to implement the dual protections prescribed by *MFW* (affirmed by *M&F Worldwide*). That, in turn, leaves the board exposed to entire fairness review in the event the court in a post-closing challenge to an allegedly conflicted controller transaction disagrees with the board's assessment and determines that the blockholder is, as a matter of law and fact, a controlling stockholder.

[7] *See, e.g.*, *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016) (holding that a well-pled complaint supporting a reasonable inference that the transaction either involved a conflicted controller (without adequate *MFW* protections) or was approved by an uninformed or coerced stockholder vote will defeat a *Corwin* defense at the pleading stage); *In re Merge Healthcare, Inc.*, 2017 WL 395981, at *6–7 (Del. Ch. Jan. 30, 2017) (same); *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *15 (Del. Ch. May 31, 2017) (same); *van der Fluit v. Yates*, 2017 WL 5953514, at *5 (Del. Ch. Nov. 30, 2017) (same).

stage business judgment deference and to secure post-closing discovery in the wake of a stockholder vote approving a transaction.[8]

Plaintiffs' Complaint seeks to traverse both paths. It alleges that, notwithstanding its less-than-majority position, Brookfield is Rouse's controlling stockholder owing fiduciary duties of care and loyalty to the minority stockholders. According to Plaintiffs, since Defendants do not dispute that the Rouse board of directors failed to follow the dual *MFW* procedural imperatives, its members cannot claim business judgment protection at the pleading stage in connection with this conflicted controller transaction. Alternatively, the Complaint alleges that the Company's proxy statement relating to the Merger was inadequate. Consequently, according to Plaintiffs, the stockholder vote approving the Merger was coerced and uninformed such that Defendants cannot avail themselves of *Corwin* "cleansing."

For their part, Defendants maintain that the Complaint must be dismissed because it does not plead facts that support the rare reasonable inference that a stockholder with less than 50% ownership is nevertheless a controlling stockholder.[9] Nor does the Complaint allow a reasonable inference that the overwhelming stockholder vote approving the Merger was uninformed or coerced.

---

[8] *See Sciabacucchi*, 2017 WL 2352152, at *14–15.

[9] As noted, the Board did not negotiate *ab initio* for the dual protections required for pleading-stage business judgment deference in the controller squeeze-out context. For that reason, Defendants do not seek to invoke *MFW*. Tr. of Oral Arg. Dec. 19, 2017 ("Tr.") 23.

4

Because Plaintiffs seek to avoid *Corwin*'s cleansing effect by arguing that Brookfield was Rouse's controlling stockholder, I take up that issue first. I find that Plaintiffs have not pled facts that allow a reasonable inference that Brookfield was a controller. Thus, the breach of fiduciary duty claim against Brookfield must be dismissed. Given that finding, *Corwin* applies. After an appropriately deferential review of the operative Complaint, I am satisfied Plaintiffs have failed to well-plead that the stockholder vote approving the Merger was uninformed or coerced. Accordingly, I review the Complaint's allegations with respect to the Merger under the business judgment rule. Because there is no pled claim for waste, I dismiss the fiduciary duty claims against the individual Defendants as well. Finally, in the absence of viable breach of fiduciary duty claims, the aiding and abetting claim against Brookfield must also be dismissed. My reasoning follows.

## I. BACKGROUND

I have drawn the facts from the well-pled allegations in the Complaint, documents incorporated therein by reference and those matters of which the court may take judicial notice.[10] At this stage, I have accepted all well-pled allegations in the Complaint as true.[11]

---

[10] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

[11] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

## A. Parties and Relevant Non-Parties

Non-party Rouse, a Delaware corporation, was a real estate investment trust ("REIT") prior to the Merger and its common stock was traded on the New York Stock Exchange.[12] It operated a portfolio of 36 malls and retail centers across 21 states.[13]

Plaintiffs, the George Leon Family Trust and Dr. Robert A. Corwin, were owners of Rouse common stock at all relevant times.[14] The "Individual Defendants" are the five members of Rouse's special committee formed to consider the Merger (the "Special Committee" or the "Committee"): Andrew Silberfein, Michael Hegarty, Christopher Haley, David Kruth and Michael Mullen.[15] The remaining members of Rouse's board of directors (the "Board"), Jeffrey Blidner, Richard Clark and Brian Kingston, are not defendants in this action.[16]

The "Brookfield Defendants" are Brookfield Asset Management Inc. ("BAM"), a Canadian corporation, and several of its affiliates. BAM is "a global alternative asset manager focused on real estate, infrastructure, and renewable power

---

[12] Am. Compl. ("Compl.") ¶ 28.

[13] Compl. ¶ 28.

[14] Compl. ¶¶ 9–10.

[15] Compl. ¶¶ 11–16.

[16] Compl. ¶¶ 29–32.

with approximately $225 billion in assets under management."[17]  Its stock is publicly traded on the New York Stock Exchange.[18]  As of the Merger, Brookfield, mainly through Brookfield Property Partners L.P. ("BPY") and BAM, owned 33.5% of Rouse's outstanding common stock.[19]

**B. Rouse's Spin-Off**

Prior to 2012, Rouse was a wholly-owned subsidiary of General Growth Properties, Inc. ("GGP") which, at the time, was 40% owned by Brookfield.[20]  In January 2012, GGP spun off Rouse to its shareholders, retaining only a 1% non-voting interest in the Company (the "Spin-Off").[21]  The Complaint alleges that, after the Spin-Off, Brookfield selected Individual Defendants Silberfein, Haley, Kruth and Mullen to join the Board as purportedly independent directors, and designated three directors as its Board representatives (the current designees are non-party directors Blidner, Clark and Kingston).[22]

---

[17] Compl. ¶ 17.

[18] Compl. ¶ 17.

[19] Rouse Properties, Inc. Definite Proxy Statement, May 25, 2016 (the "Proxy" or the "Proxy Statement") 1.

[20] Compl. ¶¶ 11, 33.

[21] Compl. ¶ 33.

[22] Compl. ¶¶ 35–36.

7

## C. Rouse-Brookfield Transactions Prior to the Merger

Plaintiffs allege that Brookfield's influence over the Rouse Board is revealed in a series of transactions between Rouse and Brookfield on terms favorable to Brookfield. In 2012, Rouse conducted a stock purchase rights offering through which existing stockholders could buy shares at $15 per share for one month.[23] At that time, the shares were trading at around $13.75.[24] The Complaint alleges that less than 15% of non-Brookfield shareholders participated in the offering.[25] Thus, to avoid the offering's failure, the Board caused Rouse to pay Brookfield a $6 million fee to guarantee its "success."[26] Upon completion of the offering, Brookfield had acquired an additional 11.35 million shares making it a 54% Rouse stockholder.[27]

Following this acquisition, Rouse engaged in two allegedly questionable transactions with its new majority owner, Brookfield. *First*, Rouse transferred $150 million to a Brookfield subsidiary, Brookfield U.S. Holdings, in the form of a demand deposit with a return of Libor plus 1.05%, which was due to mature

---

[23] Compl. ¶ 46.

[24] Compl. ¶ 46.

[25] Compl. ¶ 46.

[26] Compl. ¶ 46.

[27] Compl. ¶¶ 37, 46.

approximately one year later.[28]  Plaintiffs allege that Rouse's decision to place such substantial funds into a Brookfield affiliate with a below-market interest return, rather than in a higher rated financial institution offering at least market interest rates, supports the inference that Brookfield controlled Rouse.  *Second*, around the same time, "Rouse opened a $100 million credit line with Brookfield U.S. Holdings that cost Libor plus 8.5[%], plus a onetime initiation fee of $500,000."[29]  With regard to this transaction, Plaintiffs point to the fact that Rouse agreed to pay a substantially higher interest rate on Brookfield's money than Brookfield was required to pay on Rouse's money—again, evidence of Brookfield's control over Rouse decision-makers.  The credit line remains untouched.[30]

**D. The Brookfield Offer and Formation of the Special Committee**

On January 16, 2016, Brookfield made a written, unsolicited, non-binding proposal to acquire Rouse's outstanding common stock not already owned by Brookfield.[31]  The offer was for $17 per share in cash.[32]  By this time, Brookfield

---

[28] Compl. ¶ 46.

[29] Compl. ¶ 46.

[30] Compl. ¶ 46.

[31] Compl. ¶ 48.

[32] Compl. ¶ 48.

had reduced its Rouse holdings to 33.5%.[33]  In response to the offer, the Board formed the Special Committee comprised of all Board members except those designated to represent Brookfield (Blidner, Clark and Kingston).[34]  The Committee was vested with full authority to negotiate with Brookfield or consider other strategic alternatives.[35]

### 1. The Special Committee Directors

Special Committee members, Haley, Kruth and Mullen, had been on the Board since the Spin-Off in January 2012.  Aside from the fact that Brookfield selected them to serve on the Board following the Spin-Off, Haley, Kruth and Mullen have no ties to Brookfield.  As for the remaining two Committee members, Silberfein and Hegarty, however, the Complaint alleges the existence of "disabling conflicts that prevented them from acting independently of [] Brookfield."[36]

---

[33] Compl. ¶¶ 2, 38.

[34] Compl. ¶ 50.

[35] Compl. ¶ 50.  The Committee's mandate provided it with all "power and authority with respect to the BAM proposal and any alternatives thereto, including, among other things, the power and authority to evaluate, accept, reject and/or negotiate the proposal, explore and solicit other proposals, and to cause the Company to take any and all corporate and other actions, and/or enter into any agreements with BAM or third parties, and/or adopt any measures, in response to or in connection with the BAM proposal, all as may be determined by the Special Committee in its sole discretion." *Id.*

[36] Compl. ¶ 51.

Silberfein was Rouse's President and CEO prior to and following the Spin-Off and remained in that position throughout the negotiations leading up to the Merger. Plaintiffs challenge his independence based on his employment "at the pleasure of Brookfield" and the compensation he received from Rouse upon the approval of Rouse's three-person compensation committee allegedly chaired by a Brookfield-designated director, Clark.[37] According to Plaintiffs, Silberfein's loyalty to Brookfield was further secured after the Committee adopted a Silberfein-designed "Retention Plan" for Rouse's senior executives.[38] The Retention Plan, along with Brookfield's repeated requests during negotiations to speak with Silberfein (and other Rouse executives) about post-Merger employment,[39] allegedly provided Silberfein with additional incentives to close the deal with Brookfield rather than consider the Merger independently on its merits.[40]

---

[37] Compl. ¶ 52. The Complaint alleges that "Silberfein derived his livelihood from his employment at Rouse, having received total compensation valued at over $13 million from 2012 to 2014." *Id.*

[38] Compl. ¶ 53. The terms of the Retention Plan are discussed in detail below.

[39] Compl. ¶ 57. It is undisputed that Silberfein resigned after the Merger closed.

[40] The Complaint also alleges that the Merger Agreement led to the accelerated vesting of equity awards, which would be worth $3.3 million to Silberfein. Compl. ¶ 55. This amount does not include the "68,077 shares of restricted stock Silberfein was granted on February 18, 2016," leading to an additional "windfall" of $1.2 million for Silberfein. Compl. ¶ 56.

Plaintiffs also question Hegarty's independence. They allege that Hegarty has "strong past ties to affiliates of [] Brookfield"[41] through his prior service on the board of a Brookfield-controlled company, Brookfield Office Properties, Inc. ("Brookfield Office"), until June 2014, and his exclusion from an independent committee of Brookfield Office's board when that company was considering a transaction with BPY.[42] According to the Complaint, Hegarty's prior Brookfield Office board service, and his "conceded" lack of independence with respect to the prior transaction, support a reasonable inference that he also lacked independence from Brookfield with respect to the Merger.

## 2. The Special Committee Advisors

Throughout several meetings between January 16, 2016, and January 18, 2016, the Committee interviewed three law firms and four investment banks. It ultimately retained Sidley Austin LLP ("Sidley"), the Company's legal counsel, as its legal advisor and Bank of America Merrill Lynch ("Bank of America") as its financial advisor.[43] The Committee cited the advisors' "experience in advising special committees in M&A transactions and in the REIT and mall space" as bases

---

[41] Compl. ¶ 58.

[42] Compl. ¶¶ 59–61.

[43] Proxy 22; Compl. ¶ 62.

for its decision.[44]  In its selection process, the Committee considered the advisors'

independence from Brookfield, taking into account that

> most, if not all, investment banks with the desired experience would
> likely have provided financial services to [Brookfield] and, therefore,
> [the Committee] focused on the relative independence of the proposed
> M&A advisory teams interviewed and, in particular, on a lack of recent
> engagements by [Brookfield] with respect to M&A and similar
> investment banking transactions.[45]

The Committee concluded that neither Sidley nor Bank of America had

"significant" conflicts.  With respect to Bank of America specifically, the Committee

determined that any compensation Bank of America had received from Brookfield

did not "impair [Bank of America's] ability to perform its financial advisory services

to the Special Committee."[46]   The Committee received additional information

concerning Bank of America's potential conflicts throughout the Merger

negotiations and determined that none of that information provided grounds to

terminate the engagement.[47]

---

[44] Proxy 22.

[45] Proxy 22.

[46] Proxy 22; Compl. ¶¶ 62–63.

[47] Proxy 23, 30.

### 3. The Special Committee Process and Negotiations

From the time of its formation on January 16, 2016, until the execution of the Merger Agreement on February 25, 2016, the Committee convened fourteen meetings.[48] On February 4, the Committee met and reviewed potential responses to the Brookfield proposal and strategic alternatives for the Company with Sidley and Bank of America.[49] At this meeting, Bank of America presented the Committee with "20 potential financial buyers . . . , approximately five potential strategic buyers . . . and more than 20 potential joint venture partners or buyers of selected assets," noting that Silberfein and Bank of America had only received a small number of calls from interested parties since the announcement of the Brookfield offer.[50] The Committee did not, at that time, direct Bank of America to make contact with any other potential interested parties.

---

[48] Proxy 23. To facilitate arms-length bargaining, upon the Committee's request, "on January 18, 2016, the Company and BAM entered into a standstill agreement pursuant to which BAM agreed that neither it nor certain of its affiliates would, other than pursuant to a written agreement with the Company and subject to certain limited exceptions, acquire beneficial ownership (broadly defined) of any additional shares of [Rouse] Common Stock prior to March 4, 2016." Proxy 22–23.

[49] Proxy 24. The review of strategic alternatives included a study of management projections to evaluate Rouse's prospects as a standalone company. *Id.*

[50] Proxy 24.

The Committee unanimously decided to reject Brookfield's initial $17 offer as "inadequate and not in the best interest of the Company or its stockholders."[51] It directed Sidley to communicate its rejection to Brookfield and to advise Brookfield that the Committee would "likely insist that any transaction with [Brookfield] include a condition that it be approved by the holders of a majority of the Company's shares held by Unaffiliated Stockholders of the Company."[52] Upon receiving this news, Brookfield's counsel, Weil, Gotshal & Manges LLP ("Weil"), responded that Brookfield "likely would object to such a condition."[53]

On February 8, Brookfield made an offer of $17.75 per share. The Committee rejected the offer that same day, explaining that it was looking for an offer "closer to $19 per share" with a "majority of the minority" provision.[54] In response to this rejection, on February 9, Brookfield made its "best and final" offer of $18.25 per share, including the following additional terms:

(i)   Suspension of payment of all dividends through closing;

(ii)   A $40 million termination fee;

(iii)   No "majority of the minority" provision;

---

[51] Proxy 24.

[52] Proxy 25.

[53] Proxy 25.

[54] Proxy 25.

15

(iv) A no-shop provision with matching rights for Brookfield (with a fiduciary out); *and*

(v) Brookfield's ability to discuss post-closing employment with Rouse's management prior to signing the Merger Agreement.[55]

The Committee met that same evening, decided to reject Brookfield's supposed "best and final" offer and authorized a counter-proposal of $18.50 per share with a "majority of the minority" provision and a commitment from Brookfield that it would not engage in pre-Merger discussions of employment with the Company's management.[56] It agreed to accept the no-shop provision, termination fee and the suspension of dividend payments if Brookfield accepted the other elements of the Committee's counter-proposal.[57]

The Committee reconvened again later that evening after Brookfield rejected the Committee's latest counter-proposal. In response, the Committee lowered the

---

[55] Proxy 25.

[56] Proxy 26.

[57] Proxy 26. In making this decision, the Committee determined that "a go-shop would likely not be of much value to the Company given: (i) the lack of interest on the part of other potential bidders since BAM's announcement of its January 16 proposal; (ii) BAM's existing ownership stake in the Company; (iii) an unsuccessful process to sell the Company in 2013; (iv) deteriorating market conditions (including the fact that the equity REIT sector of the stock market had fallen an additional 6% in the preceding few days and had declined by approximately 10% since the beginning of the year, with the Company's peers declining even more dramatically); and (v) the fact that BAM repeatedly emphasized that its February 9 Offer was its 'best and final.'" *Id.* The Special Committee "also noted that BAM had not requested an exclusivity agreement from the Company, and that the Company could continue to seek alternative proposals until a merger agreement was executed with BAM (which was expected to take two weeks or more)." *Id.*

ask to $18.25 but reiterated its insistence upon a "majority of the minority" provision.[58]  Appreciating that the Merger Agreement would include a "no-shop" provision, the Committee also instructed Bank of America to contact the potentially interested parties that it had previously identified.[59]

On February 10, the Committee met with its advisors again to discuss Rouse's existing take-over defenses and the adoption of a stockholder rights plan in the event of a hostile tender offer by Brookfield.[60]  Later that day, Brookfield advised that it would accept the "majority of the minority" provision, but renewed its request to initiate post-Merger employment negotiations with management (especially Silberfein).[61]  The Committee reconvened to discuss with its advisors Brookfield's request.[62]  Silberfein indicated that he would be willing to resign if the Committee thought it necessary, but shared his view that "now was not the appropriate time for him to do so."[63]  Given Silberfein's reluctance to resign from the Committee,

---

[58] Proxy 27.

[59] Proxy 27.

[60] Proxy 28.

[61] Proxy 28.  Brookfield "asked if Mr. Silberfein would be willing to resign from the Special Committee in order to permit such discussions to occur."  *Id.*

[62] Proxy 28.

[63] Proxy 28.

Brookfield backed off its requests and, ultimately, no pre-Merger employment talks took place.[64]

Following the parties' agreement in principle, their legal advisors exchanged several drafts of the necessary agreements.[65] In the midst of these discussions, Bank of America informed the Committee that it had contacted more than forty potential bidders and, of those, sixteen had signed confidentiality agreements.[66] Bank of America noted that

> (i) many of the parties contacted indicated that they were not interested in the mall property sector in which the Company operated, (ii) a number of parties contacted indicated that they likely could not bid more than [Brookfield's] publicly announced initial purchase price of $17.00 per share and (iii) a number of the parties contacted indicated that they were concerned about investing resources to explore a strategic transaction with the Company given the large equity position that [Brookfield] already held in the Company.[67]

In response specifically to the potential chilling effect of Brookfield's offer, Bank of America advised that "the Special Committee might be able to assuage concerns by

---

[64] *See* Compl. ¶ 57.

[65] The Merger Agreement was not conditioned on due diligence. Proxy 28. Weil sent a due diligence request list, which it viewed as "confirmatory in nature." *Id.* The other Merger-related agreements included a confidentiality agreement (which Brookfield executed on February 16, thereby gaining access to Rouse's data room), an exchange agreement and a voting agreement. Proxy 28–29.

[66] Proxy 29 (describing a February 17 Committee meeting).

[67] Proxy 29.

informing [interested] parties, at the appropriate time, that it would consider reimbursing some or all of their expenses if they advanced to a second round of the process."[68] That measure was never approved.

After further negotiations, the Committee met again on February 22 and learned that Brookfield had communicated that it would not vote its shares in favor of a superior proposal, that it refused Sidley's request to extend the standstill it had entered with the Company at the beginning of the negotiations[69] and that it wanted Rouse to reimburse Brookfield's expenses if the Merger was terminated due to a "naked no-vote."[70] The Committee instructed Sidley to inform Brookfield that it rejected Brookfield's request for expense reimbursement but would accept Brookfield's refusal to vote for a superior proposal and its refusal to extend the standstill *if* Brookfield agreed not to prohibit the Company from adopting a stockholder rights plan.[71]

---

[68] Proxy 29.

[69] Proxy 29. The Company and Brookfield had entered into the standstill agreement on January 18, 2016. Proxy 22.

[70] Proxy 29. A "naked no-vote" is a shareholder vote rejecting the proposed transaction without a topping superior bid. *See, e.g.*, *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 656–57 (Del. Ch. 2008). Brookfield also requested that the Company instruct other bidders to return or destroy confidential information promptly. *Id.*

[71] Proxy 30.

On February 24, Sidley informed the Committee that Brookfield objected to Rouse's adoption of a stockholder rights plan.[72] The Committee discussed the objection and scenarios in which Brookfield might purchase additional shares and the effects of such purchases.[73] During this same meeting, Bank of America presented an overview of its efforts to solicit interest from third parties.[74] Of the forty-three potentially interested parties contacted, twenty-nine had declined the opportunity to explore a transaction, four had not responded and, of the nine that had submitted an initial mark-up of the confidentiality agreement, only six had finalized and executed the agreement.[75] Of those six, only four had accessed the data room.[76]

Following this presentation, the Committee received Bank of America's opinion that Brookfield's $18.25 per share offer "was fair, from a financial point of view" to nonaffiliated shareholders.[77] The Committee then unanimously voted to approve the Merger at $18.25 per share subject to Brookfield's agreement to a

---

[72] Proxy 30–31.

[73] Proxy 30.

[74] The Complaint alleges that "[i]t is unclear whether all of the parties that had expressed unsolicited interest in exploring an acquisition were contacted by [Bank of America] in this process." Compl. ¶ 73.

[75] None of the six had asked any follow-up due diligence questions or requested additional information. Proxy 31.

[76] Proxy 31.

[77] Proxy 31.

provision allowing the Company to adopt a stockholder rights plan between the signing and closing of the Merger.[78] Immediately thereafter, with Blidner, Clark and Kingston recused (as they had been throughout the process), the Board convened and unanimously voted to approve the Merger terms as negotiated and approved by the Committee.[79] After further discussions with Brookfield over the stockholder rights plan, the parties signed the Merger Agreement on February 25, 2016.[80] On June 23, 2016, 82.44% of Rouse's unaffiliated stockholders voted in favor of the Merger and the Merger closed on July 6, 2016.[81]

## E. The Merger Agreement

The Merger Agreement, dated February 25, 2016, was among BSREP II Retail Pooling, LLC (the "Parent"), BSREP II Retail Holdings Corp. (the "Acquisition Sub"), both Brookfield affiliates, and Rouse, with the remaining Brookfield Defendants (except BAM) serving as guarantors.[82] Because Plaintiffs

---

[78] Compl. ¶ 74.

[79] Proxy 32.

[80] Proxy 33. On March 4, 2016, the Committee decided not to implement a stockholder rights plan after Brookfield communicated that it did not intend to purchase additional shares and that it would provide the Company at least two business days' notice if it changed its intention. *Id.*

[81] Individual Defs.' Opening Br. in Supp. of their Mot. to Dismiss ("Individual Defs.' Opening Br.") 20; Rouse Form 8-K, June 6, 2016 at 2.

[82] Proxy 20, A-1. BSREP II Retail Holdings Corp. served as "Acquisition Sub" only and its existence ceased at the time of closing. Proxy 20.

allege that the Merger was structured in a manner that further reveals Brookfield's control over Rouse, I highlight the key elements of the Merger below.

## 1. The Merger Structure

The Merger consisted of two phases. During the first phase, the Brookfield affiliates with Rouse ownership stakes would exchange their common stock for newly created shares of Series I preferred stock (the "Exchange").[83] During the second phase (the period between the signing and closing of the Merger), the Parent could cause Rouse to consummate certain transactions (the "Requested Transactions"). Specifically, it could,

> in its sole discretion, upon reasonable notice to the Company (but at least five business days prior to the Exchange Closing Date), [] require the Company to:
>
> - sell or cause to be sold any amount (including all or substantially all) of the capital stock, shares of beneficial interests, partnership interests or limited liability interests owned, directly or indirectly, by the Company in one or more subsidiaries to any person at a price (not less than reasonably equivalent value) and on terms as designated by Parent;
> - sell or cause to be sold any (including all or substantially all) of the assets of the Company or one or more subsidiaries to any person at a price (not less than reasonably equivalent value) and on terms as designated by Parent;
> - contribute any of the assets of the Company or one or more subsidiaries designated by Parent to the capital of any subsidiary;

---

[83] Proxy 78.

22

- declare and/or pay any dividends or other distributions to holders of Company Shares (including the Closing Dividend); and
- take any other action requested by Parent.[84]

The Merger Agreement further provided, however, that

> the consummation of the Requested Transactions shall be conditioned upon the consummation of the Exchange, none of the Requested Transactions will delay or prevent the completion of the Merger, neither the Company nor any subsidiary will be required to take any action in contravention of any laws or organizational documents of the Company or such subsidiary, the Requested Transactions (or the inability to complete the Requested Transactions) will not affect or modify in any respect the obligations of Parent and Acquisition Sub under the Merger Agreement, including payment of the transaction consideration, and neither the Company nor any subsidiary will be required to take any action that would adversely affect the classification of the Company as a REIT. If the Merger Agreement is terminated, Parent will reimburse the Company for all reasonable out-of-pocket costs incurred by the Company in connection with any actions taken in connection with the Requested Transactions and Parent will indemnify and hold harmless the Board, the Company, its subsidiaries and their affiliates and representatives from and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred by them in connection with or as a result of taking such actions in connection with the Requested Transactions.[85]

Following this second phase, the Acquisition Sub would then merge into Rouse with Rouse being the surviving company.[86]

---

[84] Proxy 90.

[85] Proxy 90.

[86] Proxy 78.

23

## 2. The Transaction Price

According to the Complaint, the Merger consideration grossly undervalued the Company.[87] It is alleged that Brookfield's offer came at a time when Rouse's stock price was significantly depressed. It is also alleged that, at the time of the offer, Rouse's Board was aware that the Company had completed the prior quarter and fiscal year with "quite good" results.[88] These results were not released to the public until February 29, 2016, after the announcement of the Merger.[89]

## 3. The Deal Protections

The Merger Agreement included certain deal protections, including a no-solicitation provision, matching rights and a termination fee.[90] The no-solicitation

---

[87] Compl. ¶ 79. The Complaint quotes the "National Real Estate Investor Online" as saying that Rouse was "outperforming its peers" and market analysts who expected the Merger consideration to be "materially higher than Brookfield's initial foray." Compl. ¶¶ 84, 86.

[88] Compl. ¶ 80. It is alleged that "the Company's stock traded as high as $18.16 in November 2015, before it began to decline with the rest of the market." Compl. ¶ 79. Thereafter, in the three months ending in December 2015, "the Company was performing well and continuing to improve operations." Compl. ¶ 82. According to the Complaint, the Committee was aware of the Company's positive financial results and knew that the Merger price was "on the lower end of [Bank of America]'s range of fair prices." Compl. ¶ 85.

[89] Compl. ¶¶ 82–83.

[90] Plaintiffs maintain that through these "onerous deal protection devices," the Committee "ensured no superior offer would emerge post-signing." Compl. ¶ 87. The deal protections, combined with Brookfield's significant ownership stake, provided an "almost zero" likelihood of a superior proposal. Compl. ¶ 95. According to the Complaint, the Company acknowledged as much in its public filings. Compl. ¶ 96. Specifically, it is alleged that in its March 8, 2016 Form 10-K (at ITEM 1A), Rouse admitted that "the Deal Protections improperly limited the Special Committee's ability to investigate and pursue

24

provision prevented the Company from soliciting potential inquiries from third parties, disclosing non-public information to interested parties and endorsing or recommending unsolicited proposals (except under limited circumstances). It also required the Company to terminate ongoing discussions with potential acquirers.[91] The matching right limited the Board's ability to entertain new bids. It allowed the Board to consider only those bids that were likely to lead to a superior proposal and gave Brookfield the right to access information about the competing proposal and to match the proposal within four days.[92] Finally, the Merger Agreement included a $40 million termination fee that was triggered if the Committee agreed to an alternative transaction.[93]

### F. The Retention Plan

During the course of the negotiations with Brookfield, the Committee recognized that it might lose certain senior executives after Brookfield's offer was announced. It was concerned that these departures might be disruptive to ongoing

---

superior proposals and alternatives, including a sale of all or part of Rouse," thereby ensuring that the Merger was "a *fait accompli*." Compl. ¶¶ 97–98.

[91] Compl. ¶ 88.

[92] Compl. ¶ 89.

[93] Compl. ¶¶ 91–92. The termination fee "represent[ed] 3.8% of Rouse's estimated $1.06 billion equity value pursuant to the terms of the [Merger]." Compl. ¶ 92.

operations and to a transition following a merger.[94] Accordingly, members of the Committee and Brookfield contacted Silberfein in late January 2016 to discuss these concerns.[95] At the suggestion of the Committee, Silberfein prepared a proposal for an executive retention plan. That plan provided that each of four designated executives (including Silberfein) would be eligible to receive significant cash retention awards based on a percentage of their 2015 salaries and target performance bonuses.[96]

The payments were to be made in two 50% installments. The first installment would be paid "on the earlier of (i) a determination by the Committee that it has terminated the process of considering and responding to the Brookfield Offer and any related process to explore strategic alternatives thereto . . . and (ii) the Closing [of the Merger]." The second would be paid six months thereafter.[97] After discussing the Retention Plan with an independent consultant, the Committee (with Silberfein recused) unanimously approved it on January 29.[98]

---

[94] Proxy 24.

[95] Proxy 24.

[96] Proxy 59. According to the Complaint, "Silberfein was entitled . . . to receive a retention bonus equal to 200% of his 2015 base salary and target bonus, or a total of $3 million." Compl. ¶ 53.

[97] Proxy 59–60.

[98] Proxy 24. The independent compensation consultant was JL Board Advisors, LLC. *Id.*

## G. Procedural Posture

In their original complaint, Plaintiffs made no allegations regarding deficient disclosures relating to the Merger. They did, however, seek to enjoin the closing of the Merger before the vote based on a flawed sales process. The Court declined to consider that motion on an expedited schedule prior to the stockholder vote, principally on the ground that Plaintiffs had not identified any prospect that a superior bid would be forthcoming if an injunction was entered.[99]

In their post-closing Complaint, Plaintiffs plead three counts: Count I alleges that the Brookfield Defendants breached their fiduciary duties as controlling stockholders; Count II alleges that the Individual Defendants breached their fiduciary duties as members of the Committee; and Count III alleges that the Brookfield Defendants aided and abetted the Individual Defendants in their breaches of fiduciary duties. Both the Brookfield Defendants and the Individual Defendants have moved for dismissal pursuant to Court of Chancery Rule 12(b)(6). The Brookfield Defendants argue that Plaintiffs have failed adequately to plead either that Brookfield was a controller that owed fiduciary duties to the minority stockholders (Count I) or that Brookfield aided and abetted the Individual

---

[99] D.I. 30. *See C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' Ret. Trust*, 107 A.3d 1049, 1070, 1072–73 (Del. 2014) ("In a situation like this one, where no rival bidder has emerged to complain that it was not given a fair opportunity to bid . . . the Court of Chancery should be reluctant to take the decision out of [the stockholders'] hands.").

Defendants in breaching their fiduciary duties (Count III). All Defendants argue that Count II must be dismissed under *Corwin* since the Merger was approved by a majority of the unaffiliated Rouse stockholders in a fully-informed, uncoerced vote.

## II. ANALYSIS

Under Court of Chancery Rule 12(b)(6), a complaint must be dismissed if the plaintiff would be unable to recover under "any reasonably conceivable set of circumstances susceptible of proof" based on the facts as pled in the complaint.[100] In considering a motion to dismiss, the court must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in plaintiff's favor.[101] The court need not accept, however, conclusory allegations that lack factual support or "accept every strained interpretation of the allegations proposed by the plaintiff."[102]

### A. Brookfield is not a Controller

Under *Corwin*, the business judgment rule applies to transactions where no controlling shareholder is involved and "a majority of the Company's disinterested shareholders approves the transaction with a fully informed, uncoerced vote."[103]

---

[100] *See Gen. Motors*, 897 A.2d at 168; *Savor*, 812 A.2d at 896.

[101] *Id.*

[102] *Id.*

[103] *Corwin*, 125 A.3d at 309.

"The rationale of this line of cases is simple—where holders of a majority of stock vote to evince their determination that the transaction is in the corporate best interest, there is little utility in a judicial second-guessing of that determination by the owners of the entity."[104]  What logically follows from that acknowledgement, however, is that the Court can only give deference to a stockholder vote when that vote truly represents the stockholders' independent determination of the transaction's merits. Thus, at the pleading stage, *Corwin* cannot protect a board's determination to recommend a transaction when it is reasonably conceivable that a conflicted controller may have influenced the board and stockholder decisions to approve the transaction.[105]  Why?  Because our law recognizes that "controller transactions are inherently coercive," and that a transaction with a controller "cannot, therefore, be ratified by a vote of the unaffiliated majority."[106]  "[T]he concern is that fear of

---

[104] *Sciabacucchi*, 2017 WL 2352152, at *15.

[105] *Larkin*, 2016 WL 4485447, at * 10 ("For sound policy reasons, Delaware corporate law has long been reluctant to second-guess the judgment of a disinterested stockholder majority that determines a transaction with a party other than a controlling stockholder is in their best interests.") (quoting *Corwin*, 125 A.3d at 306).

[106] *Sciabacucchi*, 2017 WL 2352152, at *15; Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (And Europe) Face*, 30 Del. J. Corp. L. 673, 678 (2005) ("Consistent with the nuance that infuses our common law, Delaware is more suspicious when the fiduciary who is interested is a controlling stockholder. When that is so, there is an obvious fear that even putatively independent directors may owe or feel a more-than-wholesome allegiance to the interests of the controller, rather than to the corporation and its public stockholders. For that reason, when a controlling stockholder is on the other side of the deal from the corporation, our law has

controller retribution in the face of a thwarted transaction may overbear a determination of best corporate interest by the unaffiliated majority."[107]

Plaintiffs allege that Brookfield was a conflicted controller. Thus, the *Corwin* analysis must be deferred until that allegation is addressed. Under Delaware law, a stockholder is a controller *only* if he "(1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but *exercises control* over the business affairs of the corporation."[108] Plaintiffs acknowledge that Brookfield's Rouse holdings sum up to 33.5%. Thus, Plaintiffs must adequately plead Brookfield's controller status under the "actual control" test.

A "minority blockholder" like Brookfield "is not considered to be a controlling stockholder unless it exercises such formidable voting and managerial power that, as a practical matter, it is no differently situated than if it had majority voting control."[109] Its "power must be so potent that independent directors cannot freely exercise their judgment, fearing retribution from the controlling minority

---

required that the transaction be reviewed for substantive fairness even if the transaction was negotiated by independent directors or approved by the minority stockholders.").

[107] *Sciabacucchi*, 2017 WL 2352152, at *15.

[108] *KKR,* 101 A.3d at 991 (emphasis in original).

[109] *In re Morton's Rest. Gp. S'holders Litig.*, 74 A.3d 656, 664–65 (Del. Ch. 2013).

blockholder."[110]  Given that the "controlling stockholder" designation for a minority

blockholder imposes upon that stockholder fiduciary duties where none otherwise

would exist, our courts generally recognize that demonstrating the kind of control

required to elevate a minority blockholder to controller status is "not easy."[111]

It is true, as Plaintiffs are quick to point out, that the controller question is

often fact-intensive and, therefore, not always suitable for resolution on a motion to

dismiss.[112]  But even at the pleading stage, the facts pled in the complaint must, "if

true, imply actual control."[113]  If such facts are lacking in the complaint, then the

control question can be determined as a matter of law on a motion to dismiss.[114]

---

[110] *Id.* (internal quotation omitted).

[111] *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006); *Sciabacucchi*, 2017 WL 2352152, at *16 ("This actual control test is not an easy one to satisfy as stockholders with very potent clout have been deemed, in thoughtful decisions, to fall short of the mark.") (internal quotation omitted).

[112] *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 551 (Del. Ch. 2003).

[113] *Sciabacucchi*, 2017 WL 2352152, at *16.

[114] *See, e.g.*, *id.* at *1 ("I find—after review of the record, including a stockholders' agreement, referenced in the Complaint, that limits Liberty Broadband's ability to assert its will over Charter—that the Complaint fails to plead sufficient non-conclusory facts to make it reasonably conceivable that Liberty Broadband controls Charter."); *van der Fluit*, 2017 WL 5953514, at *7 (holding plaintiff had failed to plead facts that supported a reasonable inference regarding "the existence of a controller"); *Larkin*, 2016 WL 4485447, at *1 ("Plaintiffs have not pled facts that would allow a reasonable inference that the merger involved a controlling stockholder, much less that a controlling stockholder pushed Auspex into a conflicted transaction in which the controller received non-ratable benefits."); *KKR*, 101 A.3d at 983 ("In this opinion, I conclude that, although the allegations of the complaint demonstrate that KKR's affiliate managed the day-to-day operations of KFN, they do not support a reasonable inference that KKR controlled the board of KFN when it approved

31

When attempting to plead that a minority blockholder is the controlling stockholder of the corporation, a plaintiff may take either (or both) of two pathways. He can plead facts supporting a reasonable inference that the blockholder: (1) actually dominated and controlled the corporation, its board or the deciding committee with respect to the challenged transaction[115]; or (2) actually dominated and controlled the majority of the board generally.[116] In the first instance, the controller's presence is hard to ignore because he has injected himself as "dominator" into the board's process while it considers the transaction and is, in that sense, actually "in the board room." In the latter circumstance, the controller's presence may be more of a "looming" nature manifested by the board's awareness of his ability to make changes at the board level or to push other coercive levers should he be displeased with the board's performance or decision making. When the controller is "looming" but not directly interfering, even though he is not actually "in the board room," as a practical matter, he might as well be sitting at the head of the board room table.[117]

---

the merger, which is the operative question under Delaware law for determining whether a stockholder is controlling in this case.").

[115] *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del Ch. June 5, 2006).

[116] *Sciabacucchi*, 2017 WL 2352152, at *17; *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114–15 (Del. 1994); *Cysive*, 836 A.2d at 531.

[117] *See Cysive*, 836 A.2d at 553 ("controlling stockholders possess such potent retributive capacity that the entire fairness standard must apply regardless of the presence of an

Plaintiffs argue they have well-pled that Brookfield controlled Rouse's process with respect to the Merger and controlled Rouse's business affairs generally. I disagree.

### 1. Brookfield did not *actually control* the Committee in considering the Merger

The Complaint did allege that Brookfield controlled Rouse during the negotiations leading up to the Merger.[118] Those allegations, however, were hardly mentioned in Plaintiffs' briefing or at oral argument, apparently to make room for Plaintiffs' showcase argument that Brookfield controlled Rouse's business affairs generally.[119] Nevertheless, I address the sufficiency of Plaintiffs' allegations regarding Brookfield's purported role in Rouse's sale process as originally pled.

Plaintiffs allege that Brookfield dominated and controlled Rouse's Committee during Merger negotiations in two respects. First, they allege that Silberfein and Hegarty lacked independence from Brookfield and that their presence on the

---

independent board majority, an effective special committee, and/or a majority of the minority provision").

[118] Compl. ¶¶ 64–74.

[119] Pls.' Consol. Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Answering Br.") 27–39. The only reference to Brookfield's control with respect to the Merger process appears on page 34 of Plaintiffs' Answering Brief ("Silberfein's and Hegarty's lack of independence from Brookfield supports not only that Brookfield controlled Rouse generally, but also with respect to the transaction by virtue of their appointment to the Special Committee."); *See also*, Tr. 92:5–94:23 (brief reference to control over the process during oral argument).

Committee tainted the process. Second, they point to circumstantial evidence that allegedly reveals the Committee "tilted the playing field" in Brookfield's favor. Neither allegation is well-pled.

### a. Brookfield did not exert actual control over the Committee through Silberfein and Hegarty

As noted, the Committee comprised five directors. Of the five, Plaintiffs challenge the independence of only two, Silberfein and Hegarty. While I question whether Plaintiffs' pled facts support their contention that these two Board members lacked independence from Brookfield, even if that inference could be drawn, the lack of independence of two of the five Committee members cannot transform Brookfield from minority blockholder to controlling stockholder. Plaintiffs still must plead facts that allow a reasonable inference that Brookfield "dominate[d] the corporate decision-making process."[120] Plaintiffs' conclusory allegations land far from this mark.

Under our law, it is presumed that a director will base his decision "on the corporate merits of the subject matter before the board rather than extraneous considerations or influence."[121] In order to overcome that presumption in the controller context, the plaintiff must plead facts that support a reasonable inference

---

[120] *Superior Vision Serv., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006).

[121] *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *11 (Del. Ch. May 22, 2000).

that "the director[] [is] either beholden to the [] shareholder or so under its influence that [his] discretion is sterilized."[122]  This Complaint does no such thing.

It is alleged that Silberfein lacked independence from Brookfield because Brookfield wanted to discuss post-Merger employment with Silberfein throughout its negotiations with the Committee.  That argument might carry some weight if the Committee had actually acceded to Brookfield's persistent requests to speak with Silberfein, or if Silberfein had approached Brookfield without the Committee's permission.[123]  But Silberfein never discussed employment opportunities with Brookfield.[124]  Indeed, as it turns out, Silberfein resigned as Rouse's CEO immediately following the Merger.

Plaintiffs' allegation that Silberfein was beholden to Brookfield because a Brookfield designee sat on the Board's compensation committee likewise has no discernable effect on the "reasonably conceivable" scale.  In this regard, Plaintiffs seem content to ignore that the compensation committee comprised three members,

---

[122] *Id.*

[123] *See e.g.*, *In re Limited, Inc.*, 2002 WL 537692, at *5 (Del Ch. Mar. 27, 2002) (finding that future full-time employment is "typically of great consequence to the employee," thus, raising a reasonable doubt with respect to the employee's independence).

[124] Compl. ¶ 57.  The allegations that Brookfield's repeated overtures were enough to compromise Silberfein might allow an inference of domination and control if coupled with well-pled facts that Silberfein actually facilitated Brookfield's bargaining position at the expense of Rouse.  No such facts have been pled, however.

two of whom were unquestionably independent from Brookfield. Thus, Brookfield had no ability to dictate the terms of Silberfein's compensation. Moreover, Plaintiffs' generalized allegations based on Silberfein's compensation as CEO are precisely the type of conclusory allegations that cannot, as a matter of law, support the inference that Silberfein would "favor the fortunes of [Brookfield] over those of a company in which he holds substantial equity and has served as [CEO] for its entire existence as a publicly-held entity."[125]

Finally, Plaintiffs' allegation that Silberfein's endorsement of the Retention Plan somehow reveals his lack of independence from Brookfield ignores the terms of that plan and its clear purpose. The Retention Plan was conceived by the Committee as a means to keep key executives at Rouse after it was announced that the Company was in merger discussions. The idea was to minimize the risk that Rouse would lose members of its management team during negotiations and then fail to close a deal with a merger partner. Importantly, the executives who were to receive payments under the Retention Plan were entitled to receive them *whether or*

---

[125] *W. Nat'l*, 2000 WL 710192, at *12 (stating that it would "strain[] credulity and logic" to conclude that a director's mere "status as an executive officer . . . undermined his independence" from the company's 46% stockholder).

*not* the Merger was consummated.[126]  Under these circumstances, it is not reasonably conceivable that the Retention Plan "sterilized" Silberfein's directorial discretion.[127]

As for Hegarty, the allegations attacking his independence fail as a matter of law.  Plaintiffs allege that Hegarty cannot be independent of Brookfield because he was designated to serve on the Rouse Board by Brookfield.  Our case law is clear, however, that the appointment of a director onto the board, even by the controlling stockholder, is insufficient to call into question the independence of that director.[128]  Likewise, Hegarty's *prior* position on the board of Brookfield Office is insufficient in and of itself to raise a reasonable inference that he cannot objectively evaluate a transaction with Brookfield; indeed, Plaintiffs have not even attempted to plead how

---

[126] Proxy 59–60:

> The Retention Plan provides that the first installment is payable on the earlier of a determination by the Special Committee that it has terminated the process of considering and responding to the Transactions and any related process to explore strategic alternatives thereto in which the Special Committee may decide to engage (a "Process Termination") and the closing date of any merger, business combination or other similar transaction in respect of the Company, and the second installment is payable on the earlier of six months after any Process Termination and six months after the closing date of any merger, business combination or other similar transaction in respect of the Company.

[127] *Id.*

[128] *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) ("[I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election.").

those supposed ties were in any way material.[129] Finally, the fact that Hegarty was kept off a Brookfield Office committee that considered a prior transaction with BPY (assuming that is a fact; Defendants vigorously dispute that it is) does not support an inference that Hegarty lacked independence from Brookfield in connection with the Merger. At most, the allegation suggests that, at the time of the *other* transaction, Hegarty was deemed at some level not to be independent of BPY. That does not bear on his independence from Brookfield as a Rouse director years later in a completely separate setting.

The focus on Silberfein's and Hegarty's independence, or lack thereof, is ultimately more academic than practical because Plaintiffs have failed to plead that Brookfield dominated or controlled Rouse's "corporate decision-making process"[130]

---

[129] *See, e.g.*, *Odyssey P'rs, L.P. v. Fleming Companies, Inc.*, 735 A.2d 386, 408 (Del. Ch. 1999) (addressing director's prior involvement with the interested party, finding it not to impair the director's independence). *See also MFW*, 67 A.3d at 509 ("[M]ere allegations that directors . . . have past business relationships with the proponent of a transaction . . . are not enough to rebut the presumption of independence.").

[130] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *11 n.66 (Del. Ch. Oct. 24, 2014).

38

or that the remaining Committee members were in any way compromised.[131] This

second step is crucial, as Vice Chancellor Glasscock explained in *Sciabacucchi*:[132]

> it does not necessarily follow that an interested party also *controls* directors, simply because they lack independence. Lack of independence focuses on the director, and whether she has a conflict in the exercise of her duty on behalf of her corporation. Consideration of controller status focuses on the alleged controller, and whether it effectively controls the board of directors so that it also controls disposition of the interests of the unaffiliated stockholders . . . .[133]

That pleading, with respect to Brookfield's control over Silberfein, Hegarty or any

of the other Committee members, is missing here.

### b. The Committee did not "tilt the playing field"

At oral argument, Plaintiffs urged me to conclude from purported

circumstantial evidence that the Committee "tilted the playing field" in favor of

Brookfield in a manner that supports the inference that the Committee must have

been controlled by Brookfield.[134] At this stage, however, I am bound by the

---

[131] Plaintiffs' reference to *In re Tele-Communications* does not change the result. In that case, there was a two-person committee and one committee member's independence was in question. *In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at \*7–8 (Del. Ch. Dec. 21, 2005, revised Jan. 10, 2006). Here, the facts are undisputed that at least the majority of the Committee was independent.

[132] *Sciabacucchi*, 2017 WL 2352152, at \*17.

[133] *Id. See also Cysive*, 836 A.2d at 552 (distinguishing the concepts of board member "independence" and stockholder "control," noting that stockholders can replace board members who are not independent of the blockholder).

[134] *See, e.g.*, Tr. 92–93 ("I mean, I think in a situation where you have a 33.5 percent stockholder, where you have designees, long-standing designees with informational advantages on the board and then, as plaintiffs have alleged, a bid that's put in that's timed

allegations in the Complaint.[135]  And the allegations of a tilted playing field in the Complaint are weak.

Before addressing Plaintiffs' arguments, it is helpful to reset the table on which Plaintiffs' arguments regarding Brookfield's control over Rouse's sales process must be addressed.  Immediately upon receipt of Brookfield's unsolicited proposal, the three Brookfield directors recused themselves from "all discussions of the Board relating to . . . the Merger," and thereafter did not participate in the vote on the Merger.[136]  The Committee, established at the very outset of the negotiations with Brookfield, was comprised of non-Brookfield directors who were charged with "all the Board's power and authority with respect to the [Brookfield] proposal and any alternatives thereto."[137]  Specifically, as permitted by Rouse's Bylaws, the Committee was given "sole discretion" to respond to Brookfield's offer as it saw fit, including the "power and authority to evaluate, accept, reject and/or negotiate the

---

to be at a trough of the company's stock price on the eve of the announcement of better than-forecasted guidance, in that context, the process of a special committee that then tilts the playing field in favor of this dominant interest in the company, I think that that is indicia the Court can and should take into account in determining whether or not there was a controlling stockholder.").

[135] *Dolphin Ltd. P'ship I, L.P. v. Gupta*, 2007 WL 315864, at *1 (Del. Ch. Jan. 22, 2007) ("The Court considers only allegations put forth in the complaint, not subsequent briefs, when it evaluates a motion to dismiss.").

[136] Proxy 4.

[137] Compl. ¶ 50 (quoting Proxy 21); Compl. ¶ 4.

proposal, explore and solicit other proposals and/or explore, evaluate and effect alternatives to the [Brookfield] proposal, and to cause [Rouse] to take any and all corporate and other actions, and/or enter into any agreements with [Brookfield] or third parties, and/or adopt any measures, in response to or in connection with the [Brookfield] proposal."[138]

In keeping with its mandate, the Committee negotiated hard with Brookfield through several rounds. It rebuffed Brookfield's efforts to negotiate post-Merger employment with Silberfein, pushed for and achieved a majority of the minority voting condition despite real resistance from Brookfield and negotiated a significant increase in the Merger consideration. During the course of these negotiations, Brookfield never once threatened Rouse in any manner or sought to undermine the Committee's authority. There were no strong-arm tactics, no threats of a hostile tender offer, no attempts to block the Committee from hiring advisors, no suggestions that the Committee's pursuit of its broad mandate (including to say no or pursue other strategic alternatives) would provoke a response from Brookfield and no attempts to interfere with or influence the stockholder vote.[139]

---

[138] Compl. ¶ 50 (quoting Proxy 21). *See also* Transmittal Aff. of Daniel R. Ciarrocki in Supp. of the Brookfield Defs.' Opening Br. in Supp. of their Mot. to Dismiss the Ver. Am. Class Action Compl. ("Ciarrocki Aff."), Ex. 5 (Rouse Bylaws), art. II, § 3.

[139] *See Larkin*, 2016 WL 4485447, at *15 (describing examples in the case law where an alleged controller attempted to exert its coercive influence over a transactional process).

Notwithstanding the Board's steps to neutralize any Brookfield influence, and to bargain with Brookfield, Plaintiffs argue that Brookfield dominated and controlled the Committee and its process, as revealed by the fact that: (1) the Committee comprised directors who have served on the Board since the Spin-Off[140]; (2) the Committee hired conflicted advisors[141]; (3) the Committee included "[a]t least two members" (Silberfein and Hegarty) who had "disabling conflicts . . . [that] tainted the entire" process[142]; (4) the Committee asked Silberfein to design a Retention Plan that would motivate him "to get the deal with [] Brookfield [] done as quickly as possible"[143]; (5) the Committee agreed to an unfairly structured Merger[144]; (6) the Committee agreed to "onerous deal protection devices . . . that dissuaded any rational third party from offering Rouse a better deal"[145]; and (7) Brookfield refused to support any third-party topping bid although it knew its

---

[140] Compl. ¶¶ 13–15, 35, 50.

[141] Compl. ¶ 51.

[142] Compl. ¶ 51.

[143] Compl. ¶ 53.

[144] Compl. ¶¶ 75–76.

[145] Compl. ¶ 87.

presence as bidder "prevented" other bidders from surfacing.[146] As discussed below, none of these arguments is persuasive.[147]

*First,* as for the notion that Brookfield controlled the process because the Committee was comprised of members who may have been placed on the Board by a Brookfield affiliate, as noted, our law is clear that "a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."[148] Moreover, the Complaint does not contain a single allegation of any conflict affecting the other Committee members—specifically, Messrs. Haley, Kruth, and Mullen.

*Second*, as discussed in more detail below, Plaintiffs allegations of conflict directed towards Sidley and Bank of America are misguided. There were no disabling conflicts, and certainly none that would suggest that Brookfield exercised actual control over the Committee through the Committee's advisors.

---

[146] Compl. ¶ 71.

[147] At this point, it is important to focus on the question presented. Although unlikely, Plaintiffs' allegations regarding the Committee's process may support a claim under *Revlon*. But that question has not been called by either of the Defendants' motions or by Plaintiffs' response. Plaintiffs argue that the process defects circumstantially support a reasonable inference that Brookfield controlled Rouse's Board. Accordingly, that is the question addressed here.

[148] *KKR*, 101 A.3d at 996.

*Third,* as discussed above, the Complaint fails to support a reasonable inference that Silberfein and Hegarty lacked independence. More to the point, the Complaint contains no allegations that Brookfield was able to exploit Silberfein's or Hegarty's positions on the Committee to achieve a more favorable outcome or to exert undue influence on the other Committee members.

*Fourth*, the Retention Plan designed by Silberfein provided for him to be paid whether or not Rouse entered into the transaction with Brookfield. Thus, by the terms of the plan, Silberfein was no more motivated to close with Brookfield than he was to terminate negotiations with Brookfield and look elsewhere for a deal.

*Fifth*, the fact that the Merger structure allowed for certain Requested Transactions to be completed pre-closing does not indicate Brookfield's control. The two-phase structure of the Merger simply allowed Brookfield to make certain operational decisions at Rouse during the time between signing and closing of the Merger, while ensuring that any consequences of Brookfield's decisions would not be imposed upon Rouse should the closing not occur.

*Sixth*, the deal protections to which the Committee agreed were considered in light of, *inter alia,* Rouse's previous failed attempts to sell, the lack of interested parties at the proposed price and the practical realities of Brookfield's significant equity position. The Committee negotiated vigorously in an attempt to exclude those provisions it disfavored and to include those provisions (such as the "majority of the

minority" provision) that the Committee deemed necessary. Those negotiations do not support a reasonable inference that Brookfield controlled the Committee.

*Finally,* the structural elements of Brookfield's proposal and bargaining positions do not reveal control; they simply reveal self-interest and the practical reality of its 33.5% stake in Rouse. It is "well established" in our law that "a non-majority shareholder [can] act in its self-interest," and the fact it has done so "is not particularly probative of whether the large shareholder exercises actual control over the business and affairs of the corporation."[149] As for the argument that Brookfield's "presence" as a bidder somehow evinces its status as controller, I confess that I do not follow Plaintiffs' reasoning here. Aside from alleging generally that none of the 43 other potential bidders contacted by Bank of America decided to make a bid, Plaintiffs have alleged nothing to suggest that Brookfield did anything to influence those decisions. Moreover, if "presence" alone were enough to infer that a minority blockholder was a controller, then that inference would follow every blockholder who sought to acquire the corporation in which he holds shares, even if he, in fact,

---

[149] *W. Nat'l*, 2000 WL 710192, at * 8. *See also van der Fluit*, 2017 WL 5953514, at *6 (holding that a minority blockholder negotiating out of self-interest does not support an inference of control); *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) ("[A] stockholder is under no duty to sell its holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit the minority."); *MFW*, 67 A.3d at 508 ("Under Delaware law, [a 43% stockholder] had no duty to sell its block, which was large enough, as a practical matter, to preclude any other buyer from succeeding unless it decided to become a seller.").

did not otherwise attempt to influence the board or interfere with other potential bids. That is not our law.

## 2. Brookfield does not *actually control* Rouse generally

According to Plaintiffs, even if Brookfield's control of Rouse cannot be inferred from the manner in which the negotiations leading to the Merger unfolded, or in the terms of the Merger itself, Brookfield's general control over Rouse can be inferred from: (1) its significant ownership interest in (and prior majority ownership of) Rouse; (2) the fact that the Board saw the need to create the Committee upon receiving Brookfield's proposal, and the Committee, in turn, saw the need to insist upon a "majority of the minority" condition; (3) the disclosure in Rouse's 2014 Form 10-K to the effect that Brookfield was a "substantial stockholder" that "may exert influence over [Rouse]"; and (4) the fact that Rouse has engaged in prior "questionable" transactions with Brookfield.[150]  I take up each contention in turn after briefly reiterating the standards by which the Court must evaluate Plaintiffs' allegations of actual control.

---

[150] Pls.' Answering Br. 30–38.  Plaintiffs also allege that Brookfield's general control of the Board is demonstrated by the interest of Brookfield's three designees in the Merger and Silberfein's and Hegarty's lack of independence.  I have addressed those contentions at length above.  Suffice it to say, they fare no better in the "general control" context. *See Morton's*, 74 A.3d at 665 ("The fact that two employees of Castle Harlan sat on the board, without more, does not establish actual domination of the board, especially given that there were eight directors not affiliated with Castle Harlan.").

In *In re PNB*, when addressing the issue of actual control, the court asked whether the plaintiff had pled, "as a practical matter, [that the alleged controller] was no differently situated than if it had majority voting control."[151]  In *Paramount,* the Supreme Court observed that evidence of a controlling stockholder's general control over the board should reveal that the stockholder can:

> (a) elect directors; (b) cause a break-up of the corporation; (c) merge it with another company; (d) cash-out the public stockholders; (e) amend the certificate of incorporation; (f) sell all or substantially all of the corporate assets; or (g) otherwise alter materially the nature of the corporation and the public stockholders' interests.[152]

*Cysive* and *KKR* focused on the alleged controller's ability to be, as then-Vice Chancellor Strine described it, "the dominant force in any contested . . . election."[153] Plaintiffs' allegations of general control fail when considered against these standards.

---

[151] *PNB*, 2006 WL 2403999, at *9.

[152] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43 (Del. 1994).

[153] *Cysive*, 836 A.2d at 551–52. *See also KKR*, 101 A.3d at 994 (inquiring whether the alleged controller possessed "sufficient voting power to remove [the corporation's directors] from their positions if they rejected the merger proposal or took any other action [the stockholder] did not like.").

*First,* Brookfield's 33.5% ownership stake in Rouse is not impressive on its own.[154] Its status as majority owner of Rouse prior to the Spin-Off likewise adds little to the controller analysis.[155] Importantly, Brookfield possessed no contractual right to appoint directors and could not unilaterally replace the Board.[156] Indeed, Rouse's charter allowed for removal of directors by stockholders "*only* for cause" and then *only* by a majority vote of all stockholders.[157]

*Second,* that the Board formed a special committee to address the fact that three of its members were interested in the Brookfield deal cannot be deemed evidence of Brookfield's control. It is, instead, evidence of sound corporate governance. Likewise, the Committee's insistence upon a "majority of the minority" condition, not aptly characterized as such given that Rouse's unaffiliated stockholders *were* the majority, reflects nothing more than persistent hard bargaining

---

[154] *See Zlotnick v. Newell Companies*, 1984 WL 8242, at *2 (Del. Ch. July 30, 1984) (33% ownership "means little" in the controller analysis); *PNB*, 2006 WL 2403999 at *10 (33.5% is "an overall level of ownership that is relatively low").

[155] *Morton's*, 74 A.3d at 664–65.

[156] *Corwin*, 125 A.3d at 305–06.

[157] Ciarrocki Aff., Ex. 6 (Rouse Charter), art. VI, § C (emphasis added). *See also KKR*, 101 A.3d at 994 ("The complaint also is devoid of any allegation that KKR had a contractual right to appoint any (much less a majority) of the members of the KFN board, to dictate any action by the board, to veto any action of the board or to prevent the board from hiring advisors and gathering information in order to be fully-informed."). There is, likewise, no allegation that Brookfield "dominat[ed] Board policy." *Zlotnick*, 1984 WL 8242, at *3.

for the benefit of unaffiliated stockholders. Indeed, to hold otherwise might discourage fiduciaries from employing these important measures for fear they might unwittingly signal that they perceive a minority blockholder with whom they are dealing to be a controller.

*Third,* Rouse's disclosure in its 2014 Form 10-K that "[o]ur substantial stockholder may exert influence over us that may be adverse to our best interests and those of our other stockholders" [158] is a far cry from the outright admission that a minority blockholder was the corporation's "controlling stockholder" that the court deemed persuasive evidence of control in *In re Zhongpin.*[159] At best, this disclosure apprises stockholders of the obvious fact that Brookfield's 33.5% minority interest might potentially allow it to "influence" corporate policies and strategies. That degree of "influence," however, does not alone support an inference of actual control.[160]

*Fourth,* the alleged questionable transactions to which Plaintiffs refer—a "series of transactions" that "*seem* to show how Brookfield obtained a large block

---

[158] Compl. ¶ 39.

[159] *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457 (Del. Ch. Nov. 26, 2014).

[160] *See In re Sea-Land Corp. S'holders Litig.*, 1987 WL 11283, at *5 (Del. Ch. May 22, 1987); *Zlotnick*, 1984 WL 8242, at *2; *W. Nat'l*, 2000 WL 710192, at *6 ("substantial non-majority stock ownership, without more, does not indicate control").

of Rouse shares by spending only $13.7 million" in 2012[161]—provide absolutely no evidence of domination or control by Brookfield. What is missing from Plaintiffs' pleading with respect to these transactions is any indication of how they demonstrate the type of managerial clout and retributive power required to infer actual control.[162]

*Finally,* it cannot go unmentioned how far removed this case is from this court's self-described "most aggressive finding that a minority blockholder was a controlling stockholder" in *Cysive*.[163] The alleged controller in *Cysive* was a combined 40% blockholder, was the Chairman and CEO of the company, had a subordinate on the company's board and two family members in company executive positions, was, "by admission, involved in all aspects of the company's business, [and] was the company's creator, and . . . inspirational force."[164] He exercised, in the court's words, "day-to-day managerial supremacy" over the operations of the

---

[161] Compl. ¶ 46 (emphasis added).

[162] *See PNB*, 2006 WL 2403999, at *9; *see also W. Nat'l*, 2000 WL 710192, at *6–7 (finding that joint ventures between a company and a significant shareholder were insufficient to support a finding of domination).

[163] *Morton's*, 74 A.3d at 665. It is likely that more "aggressive" examples can be found in our post-*Cysive* case law, but *Cysive* is still generally regarded as "a benchmark for the minimum degree of managerial clout needed to meet the actual control test" where, as here, "the alleged controller's holdings are well below 50% of a company's outstanding shares." *Larkin*, 2016 WL 4485447, at *14.

[164] *Cysive*, 836 A.2d at 552.

company.[165]  And, importantly, the court was satisfied that the alleged controller could, in his roles as CEO and 40% blockholder, wield "his voting power . . . to elect a new slate [of directors] more to his liking without having to attract much, if any support from public stockholders" in the event he became "dissatisfied with the independent directors."[166]  Nothing remotely close to this level of control has been alleged here.

Instead, this case much more closely resembles the facts in *Morton's*.[167] There, the plaintiffs alleged that Castle Harlan, a 27.7% blockholder, was Morton's controlling stockholder.[168]  Castle Harlan had previously owned the entire company and had placed two of its employees onto the ten-director board with one of them serving as de-facto chair of the board.[169]  It also had proposed the transaction at issue.[170]  Viewing these facts in a light most favorable to the plaintiff, the court concluded that the complaint had failed to plead facts that allowed a reasonable inference that the alleged controller exercised "influence over even the ordinary

---

[165] *Id.* at 531.

[166] *Id.* at 552.

[167] 74 A.3d 656.

[168] *Id.* at 664–65.

[169] *Id.*

[170] *Id.* at 662.

51

managerial operations of the company," much less exerted *actual control* over a majority of the company's board.[171]

The similarities between Brookfield and Castle Harlan are striking. Both owned blocks that were less than the block at issue in *Cysive*; both once owned at least a majority stake in the company; both had placed representatives on the company's board; both proposed the transactions at issue; both did not exercise day-to-day management authority. And neither were controllers.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Brookfield was not a controlling shareholder of Rouse. Therefore, it owed no fiduciary duties to Rouse's shareholders. Count I is dismissed. And Plaintiff's argument that *Corwin* cannot apply because the Merger constituted a conflicted controller transaction is rejected.

## B. Fully Informed and Uncoerced Stockholders Approved the Merger

In *Corwin*, our Supreme Court affirmed this court's adherence to the "proposition that when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the

---

[171] *Id.* at 665–66 ("Even when these alleged facts are looked at together and in the light most favorable to the plaintiff, I cannot logically infer that Castle Harlan exercised actual domination and control over the directors, who comprised a majority of Morton's board.") (internal quotation omitted).

52

business judgment rule applies."[172] Thus, in the absence of a controller, to avoid the application of the business judgment presumption under *Corwin*, a plaintiff must well-plead that the stockholder vote approving a transaction was either coerced or uninformed.[173] Here again, the Complaint falls short.

### 1. The Stockholder Vote was not Coerced

Under *Corwin*, a stockholder vote will have no cleansing effect if the vote "may reasonably be seen as driven by matters [other than] the merits of the transaction."[174] The coercion analysis focuses on whether the stockholders were able to exercise their right to vote "free of undue pressure created by the fiduciary that distracts them from the merits of the decision under consideration."[175]

The Complaint contains no allegations that the Rouse stockholder vote was coerced inherently, structurally, situationally or otherwise.[176] In their answering brief, however, Plaintiffs suggest that the stockholder vote was coerced as a result of the timing of the Brookfield offer coupled with the Board's decision not to

---

[172] *Corwin*, 125 A.3d at 309. *See KKR*, 101 A.3d at 1001–03.

[173] *van der Fluit*, 2017 WL 5953514, at *5; *Sciabacucchi*, 2017 WL 2352152, at *15.

[174] *Sciabacucchi*, 2017 WL 2352152, at *2.

[175] *Id.* at *21.

[176] *Id.* at *2 (discussing "structural coercion"); *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *8 (Del. Ch. Mar. 31, 2017) (discussing "situational coercion").

disclose favorable financials until after the announcement of the Merger.[177]  Even if I were to assume that coercion was adequately pled, which is questionable, that dynamic, in all of its forms, played no role here.

The notion of "inherent coercion" arises in transactions involving conflicted controlling stockholders.[178]  There is no controller here; thus, there is no inherent coercion.

"Structural coercion" occurs when the Board structures the vote in a manner that requires stockholders to base their decision on factors extraneous to the economic merits of the transaction at issue.[179]  Plaintiffs do not allege or argue that the stockholder vote was structurally defective.

"Situational coercion" can arise when the board, by its conduct, creates a situation where "stockholders are being asked to tender shares in ignorance or mistaken belief as to the value of the shares."[180]  The premise of Plaintiffs'

---

[177] Pls.' Answering Br. 49.

[178] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 438 (Del. Ch. 2002); *Sciabacucchi*, 2017 WL 2352152, at *15.

[179] *Sciabacucchi*, 2017 WL 2352152, at *2.

[180] *Next Level Commc'ns, Inc. v. Motorola, Inc.*, 834 A.2d 828, 851 n.90 (Del. Ch. 2003) (internal quotations omitted).  This does not mean that a Board coerces a stockholder vote simply by failing to provide material information to stockholders.  Instead, situational coercion assumes that the Board has done or failed to do something, beyond the disclosures it provides to stockholders, that prevents stockholders from understanding the true merits or value of the transaction they are being asked to approve.  *See Saba*, 2017 WL 1201108, at *8.  *Cf. In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 621 (Del. Ch. 1999)

situational coercion theory is that the Board (and Brookfield) knew that Rouse's trading price was temporarily depressed when the Brookfield proposal came across the transom. They also knew the stock price would be lifted from the trough as soon as Q4 2015 financial results were released to the market. Nevertheless, according to Plaintiffs, the Board exploited the fact that stockholders were in the dark about the Company's promising future when it asked them to vote on the Merger. The problem with this theory, however, is that stockholders received the Q4 2015 financial results, along with the rest of the public, on February 29, 2016, nearly four months before the June 23, 2016 stockholder vote. Indeed, the financial data for all of fiscal year 2015 is clearly set forth in the Proxy for all of Rouse's stockholders, and any potential interested bidders, to see. There was no coercion here.

## 2. The Stockholders were fully informed

Plaintiffs' attempt to cast the stockholder vote as uninformed requires that they plead "a [material] deficiency in the operative disclosure document."[181] At that point, "the burden would fall to defendants to establish that the alleged deficiency fails as a matter of law."[182] When soliciting stockholder action, directors of

---

(noting that there is no coercion when stockholders are given "a free choice between maintaining their current status and taking advantage of the new status offered by [the proposed transaction].").

[181] *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *8 (Del. Ch. Jan. 5, 2017).

[182] *Id.*

Delaware corporations are obliged to provide full and fair disclosure of "all material information within the board's control."[183]  For purposes of this analysis, our courts measure the materiality of a disclosure by asking whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," not whether the information at issue "might be helpful."[184]

The Complaint alleges that four facets of the Proxy Statement caused the Rouse stockholders to be uninformed when casting their votes with respect to the Merger: (1) misleading Rouse financial projections; (2) failure to explain aspects of the Bank of America fairness opinion; (3) failure to disclose potential conflicts of interest relating to Sidley and Bank of America; and (4) failure to explain the true purpose of the Retention Plan.[185]  I address each briefly below.[186]

---

[183] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[184] *Id.* (quoting *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 919, 944 (Del. 1985)).

[185] Compl. ¶¶ 101–07.

[186] I acknowledge Defendants' argument that the Court should decline to consider Plaintiffs' disclosure challenges since Plaintiffs failed to raise them when they pressed their motion for preliminary injunction and, instead, held them "in their pocket" until after the stockholder vote when they filed their post-closing damages Complaint.  Given that I find each of the disclosure challenges to lack any merit, I decline to reach the issue of whether Plaintiffs should be barred by waiver, laches or otherwise from raising disclosure deficiencies here.

### a. The Financial Projections

Plaintiffs take issue with the fact that Bank of America, according to the Proxy, took into account the "one-time costs and assumed capital improvements" when performing its discounted cash flow analysis, but the Proxy only disclosed projections relating to operating income.[187]  According to Plaintiffs, the additional projections were necessary for stockholders to determine the value of their shares.

As an initial matter, I disagree with Plaintiffs' characterization of the Proxy's limited disclosure of financial projections.  In addition to operating income projections, the Proxy contains projections of general and administrative expenses, interest expenses, preferred distributions and, importantly, "funds from operation," a metric routinely used by REITs to "define the cash flow of their operations."[188]  Moreover, the type of particulate detail that Plaintiffs fault the Individual Defendants for not providing—detail that would facilitate the recreation of a DCF analysis—is simply not required by our law.[189]  To be sure, under Delaware law, financial

---

[187] Compl. ¶ 102.

[188] Individual Defs.' Opening Br. 30; Proxy 66–67.  The adequacy of the disclosure for purposes of valuing the Company is emphasized by Plaintiffs' own use of the figures at paragraphs 81 and 82 of the Complaint to show that "the Company was performing well and continuing to improve its operations."  Compl. ¶¶ 81–82.  The Complaint acknowledges that industry analysts similarly found this data sufficient to value the Company.  Compl. ¶ 84.

[189] *See Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *14 (Del. Ch. June 30, 2014) (plaintiff's allegation that it was "unable to determine whether the DCF is reliable . . . appears to be a transparent attempt to repackage the argument that disclosures must contain

projections are material to the average stockholder considering whether to approve a merger.[190] "A disclosure that does not include all financial data needed to make an independent determination of fair value does not, however, *per se* omit a material fact. The fact that the financial advisors may have considered certain non-disclosed information does not alter this analysis."[191] The Proxy disclosed more than adequate financial data to enable stockholders to assess the value of their shares and the quality of Bank of America's work.

### b. The Bank of America Fairness Opinion

Plaintiffs next challenge several aspects of the disclosures with respect to the fairness opinion provided by Bank of America, including: (1) the failure to adjust the dividend growth rate to reflect the Company's actual *past* dividend growth performance[192]; (2) the failure to explain the reasoning behind the selected capitalization rate; and (3) the failure to disclose what additional information

---

enough information to enable a stockholder to make an independent determination of fair value," which "argument has been rejected explicitly by our Supreme Court") (citing *Skeen*, 750 A.2d at 1174).

[190] *PNB*, 2006 WL 2403999, at *15.

[191] *In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *16 (Del. Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del. 2006).

[192] Compl. ¶ 104(a). Specifically, Plaintiffs challenge the 13.3% dividend increase by pointing to Rouse's dividend increase in prior years, which they claim was significantly above 13.3%. *Id.* They then allege that, had Rouse's past dividend growth performance been considered, the per share value reference would have been higher and would have possibly led to Bank of America declining to opine on its fairness. *Id.*

management's 2016 Business Plan contained and whether such information was relied upon by Bank of America.[193] Here again, Plaintiffs fail to identify any missing disclosures that would alter the "total mix" of information provided to shareholders.[194] The Proxy: (1) explained that Rouse management asked Bank of America to use the management-created 2016 Business Plan projections (specifically its base plan with capital markets activity) for purposes of its financial analysis, including the dividend increase set forth therein; (2) disclosed what capitalization rate Bank of America used; explained how Bank of America arrived at the range and why it did not consider the capitalization rate of another transaction; and (3) explained that Bank of America relied on projections provided by

---

[193] Compl. ¶ 104.

[194] *See Saba*, 2017 WL 1201108, at *10 ("When voting on a merger, stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender offer rely. A fair summary, however, is a summary. The relevant disclosure document must disclose the valuation methods used to arrive at that opinion as well as the key inputs and the range of ultimate values generated by those analyses. Whether a particular piece of an investment bank's analysis needs to be disclosed, however, depends on whether it is material, on the one hand, or immaterial minutia, on the other. In this regard, the summary of the banker's work need only be sufficient for the stockholders to usefully comprehend, not recreate, the analysis.") (internal quotation omitted); *see also In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *10 (Del. Ch. Oct. 16, 2013) ("to the extent the Plaintiffs' arguments for additional disclosures disagree with Excel's analysis, 'a complaint about the accuracy or methodology of a financial advisor's report is not a disclosure claim'").

management in its 2016 Business Plan and listed the key assumptions used by management in preparing those projections.[195]

The missing explanations relating to the fairness opinion identified by Plaintiffs, again, reflect the type of additional information that stockholders might find "interesting," but not the type of core information that would be material to their decision of whether to approve the Merger.[196]  They cannot, therefore, support a reasonable inference that the stockholder vote was uninformed.

### c.  The Conflicts of Interest

Plaintiffs maintain that the Proxy failed adequately to disclose potential conflicts involving Bank of America and Sidley.[197]  With respect to Bank of America, they acknowledge the Proxy disclosed that Bank of America had provided

---

[195] Proxy 63–64.

[196] *In re Sauer-Danfoss Inc. S'holder Litig.*, 65 A.3d 1116, 1131 (Del. Ch. 2011).

[197] Plaintiffs also argue that the Proxy failed to disclose "perhaps the most important conflict of all concerning the Buyout: that Rouse considered Brookfield to wield significant influence over it."  Pls.' Answering Br. 54.  They contend that while Rouse's March 9, 2015 Form 10-K disclosed Brookfield's influence, the Proxy did not.  *Id.*  This information, according to Plaintiffs' Answering Brief, was "undoubtedly material."  *Id.* at 55.  The Complaint, of course, makes no mention of this; the only conflicts identified there were the "potential conflicts of interest between [Bank of America] and Brookfield."  Compl. ¶ 105.  That is a problem.  *See Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.,* 2012 WL 6632681, at *16 (Del. Ch. Dec. 20, 2012) ("Under Rule 15(aaa), a party cannot use its brief as a mechanism to informally amend its complaint.")  In any event, the prior public filings (and the Proxy) clearly disclosed (as acknowledged by the Complaint) that Brookfield is a significant stockholder of Rouse that may influence its business decisions.  *See, e.g.*, Compl. ¶¶ 25, 96; Proxy 26.

60

services to Brookfield and that it may continue to do so, but allege that the Proxy failed to disclose the nature of the services and how much precisely Bank of America would earn from those services.[198]

It is true that "the [Committee] was obliged to disclose potential conflicts of interest of its financial advisors so that stockholders could decide for themselves what weight to place on a conflict faced by the financial advisor."[199] The Proxy did just that. It disclosed that Bank of America has provided, currently is providing and may in the future provide "investment banking, commercial banking and other financial services to [Brookfield] for which it has received and may receive compensation."[200] It further disclosed the aggregate revenues Bank of America received from Brookfield between 2014 and 2016.[201] Finally, it explained that the Committee considered this information before engaging Bank of America but determined that the potential conflicts were not material in the context of the proposed transaction or expected to impair the banker's ability to perform financial advisory services for the Committee.[202] With this information in hand, stockholders

---

[198] Compl. ¶ 105.

[199] *Saba*, 2017 WL 1201108, at *11 (internal quotation omitted).

[200] Proxy 49.

[201] Proxy 49.

[202] Proxy 22–23.

had more than enough information to evaluate Bank of America's fitness to serve as the Committee's financial advisor.[203]

Plaintiffs also take issue with the disclosures addressing the Committee's evaluation of Sidley's potential conflicts. Those disclosures note that the Committee "determined that Sidley had no significant conflicts of interest."[204] Plaintiffs find that disclosure inadequate because it does not define the threshold the Committee used to reach that conclusion.[205] Of course, Plaintiffs have not pointed to any information that would remotely suggest Sidley had a material conflict. But more to the point, the disclosure Plaintiffs seek is the kind of insignificant detail regarding

---

[203] *See Saba*, 2017 WL 12011078, at *11 ("The Proxy disclosed that, in the two previous years, Morgan Stanley or its affiliates have provided financing services to a Vector Capital affiliate and received customary fees of approximately $1 million in connection with those services. This disclosure addresses precisely what Plaintiff claims is missing, except that it does not detail the specific services rendered. Here again, Plaintiff offers no explanation of how the specific services Morgan Stanley provided to Vector affiliates in the past would materially alter the total mix of information that Saba stockholders would find important when deciding how to vote. What was material, and disclosed, was the prior working relationship and the amount of fees."); *In re Om Gp., Inc. S'holders Litig.*, 2016 WL 5929951, at *16–17 (Del. Ch. Oct. 12, 2016) (dismissing allegation of deficient conflict disclosure where the Proxy disclosed nature of the relationship, nature of past services and amount of fees paid for past services); *Cty. of York Empls. Ret. Plan v. Merrill Lynch & Co., Inc.*, 2008 WL 4824053, at *11 (Del. Ch. Oct. 28, 2008) (same).

[204] Proxy 22.

[205] Compl. ¶ 107.

process and board deliberations that, if provided, would dilute the value and purpose of public corporate disclosures.[206]

### d. The Retention Plan

Finally, Plaintiffs maintain that the disclosures relating to the Retention Plan were misleading because the Proxy did not describe why the plan was necessary and how precisely it benefited Rouse.[207] This allegation is just wrong. The Proxy, at page 24, states that the Committee had "concerns that valuable senior executives of the Company might depart given the possible disruption caused by the recent public announcement of the BAM proposal."[208] The Proxy also disclosed, "[t]he Special Committee believes that structuring the retention payments in this way encouraged the Company's senior executives to remain neutral with respect to whether the Company entered into a merger agreement with the Brookfield Filing Persons."[209] What Plaintiffs say is missing is right in the Proxy. The stockholders were not misinformed or uninformed about the Retention Plan.

---

[206] *See Abrons v. Maree*, 911 A.2d 805, 813 (Del. Ch. 2006) (holding that "insignificant details" are not material and admonishing that "Delaware courts must 'guard against the fallacy that increasingly detailed disclosure is always material and beneficial disclosure'") (internal quotation omitted).

[207] Compl. ¶ 107.

[208] Proxy 24.

[209] Proxy 60.

## C. No Waste Pled

Having determined that Plaintiffs have not adequately pled that the transaction involved a controlling stockholder, or that the stockholder vote approving the Merger was coerced or uninformed, the only claim Plaintiffs could state that would overcome application of the business judgment rule is a claim for waste.[210] They have not attempted to plead that claim. Thus, Count II must also be dismissed.[211]

## D. Aiding and Abetting

In Count III, Plaintiffs allege that Brookfield aided and abetted breaches of fiduciary duties by the Individual Defendants. Under Delaware law, to state a claim of aiding and abetting, a plaintiff must plead facts in support of the following elements: (1) the existence of a fiduciary relationship, (2) a breach of fiduciary duty, (3) defendant's knowing participation in that breach and (4) damages proximately caused by that breach.[212] Plaintiffs' allegations fail for two reasons. *First*, with

---

[210] *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 741 (Del. Ch. 2016), *aff'd*, 2017 WL 563187 (Del. Feb. 9, 2017) (TABLE) ("such an approved transaction only can be challenged on the basis that it constituted waste") (quoting *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993)); *van der Fluit*, 2017 WL 5953514, at *5 (same).

[211] Since *Corwin* applies and no waste claim was pled, I need not address the Individual Defendants' defense under 8 *Del. C.* § 102(b)(7).

[212] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

64

Count II dismissed, there is no underlying breach of fiduciary duty.[213] *Second,* there is no adequate pleading of knowing participation.[214] Brookfield was entitled to negotiate the terms of the Merger with only its interests in mind; it was under no duty or obligation to negotiate terms that benefited Rouse or otherwise to facilitate a superior transaction for Rouse.[215] To plead knowing participation in a breach of fiduciary duty, Plaintiffs were required to state facts that would support a reasonable inference that Brookfield "act[ed] with the knowledge that the conduct [of the Committee it] advocated or assisted constitutes such a breach."[216] There are no well-pled facts upon which the Court could reasonably conceive that Brookfield acted with that culpable state of knowledge.

---

[213] *Volcano*, 143 A.3d at 750 ("summarily" dismissing an aiding and abetting claim because a transaction not involving a controlling stockholder was approved by a majority of the target's disinterested stockholders in a fully informed and uncoerced vote).

[214] *See, e.g.*, Compl. ¶ 72 (explaining that Brookfield "refused to agree to vote their shares in favor of any superior proposal" and refused "to agree to any sort of structural protections that would encourage third parties to participate in the sales process"). *See Volcano*, 143 A.3d at 750 (noting that "knowing participation" requires a showing of "scienter" and that the standard for pleading the "requisite scienter" imposes a "high burden").

[215] *See Sciabacucchi*, 2017 WL 2352152, at *16 (Stockholders "are free to own, sell and vote their stock in their own self-interest. Such independence is fundamental to the separation of ownership and control that makes the corporate form a viable way to organize a business entity.").

[216] *Malpiede*, 780 A.2d at 1097.

### III. CONCLUSION

Based on the foregoing, the Individual Defendants' and the Brookfield Defendants' motions to dismiss must be **GRANTED.** The Complaint is dismissed with prejudice.

**IT IS SO ORDERED.**